Philip J. Berg, Esquire
Pennsylvania I.D. 9867
**LAW OFFICES OF PHILIP J. BERG**
555 Andorra Glen Court, Suite 12
Lafayette Hill, PA 19444-2531
Telephone:  (610) 825-3134
E-mail: philjberg@gmail.com                    *Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANDREW M. SHECKTOR and JEAN B. MARSHAMAN, | : |
| | : |
| | : CIVIL ACTION NUMBER: |
| Plaintiffs, | : |
| vs. | : |
| | : **No. 4:09-cv-1570** |
| WALMART STORES, INC. and LOUISVILLE LADDER, INC., | : |
| | : |
| | : |
| Defendants. | : |

## PLAINTIFFS RESPONSE IN OPPOSITION TO DEFENDANT, LOUISVILLE LADDER, INC.'s MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Andrew M. Shecktor ["Shecktor"] and Jean B. Marshman ["Marshman"], by and through their undersigned counsel, Philip J. Berg, Esquire, hereby Responds in Opposition to Defendant Louisville Ladder, Inc.'s ["LL" or "Defendant"] Motion for Summary Judgment.  In support hereof, Plaintiffs aver as follows:

- Summary Judgment is **not** proper as there are genuine issues of material fact in dispute;

- Defendant is **not** entitled to Judgment as a matter of law;

- At all times mentioned herein, Shecktor followed all the rules as outlined on the ladder during its use;

1

- Shecktor's injuries were caused by the poor design of Defendant's ladder, as the "foot" of the ladder abruptly fell while in use by Shecktor, as it was **<u>not</u>** properly held in place, thereby causing the ladder to shift, which caused Shecktor to fall; and

- Defendant was negligent in their design of the ladder in question, Model L-2323-16 and was aware of the faulty design as Defendant changed the design, removing the slot to secure the "foot" of said ladder **<u>after</u>** the date the incident giving rise to the within suit occurred.

1.    Plaintiffs Opposition is based upon their Opposition, the attached Memorandum of Points and Authorities in Support hereof ; upon records on file with this Court and such further oral and/or documentary evidence that may be presented at the time of the Hearing.

2.    For the reasons outlined herein, Defendant Louisville Ladder, Inc.'s Motion for Summary Judgment must be Denied.

Respectfully submitted,

Dated:  October 4, 2011

/s/ Philip J. Berg
_____
Philip J. Berg, Esquire
Pennsylvania I.D. 9867
**LAW OFFICES OF PHILIP J. BERG**
555 Andorra Glen Court, Suite 12
Lafayette Hill, PA 19444-2531
Telephone:  (610) 825-3134
E-mail: philjberg@gmail.com

*Attorney for Plaintiffs Andrew Shecktor and Jean Marshman*

Philip J. Berg, Esquire
Pennsylvania I.D. 9867
**LAW OFFICES OF PHILIP J. BERG**
555 Andorra Glen Court, Suite 12
Lafayette Hill, PA 19444-2531
Telephone:  (610) 825-3134
E-mail: philjberg@gmail.com          *Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANDREW M. SHECKTOR and          :
JEAN B. MARSHAMAN,              :
                               :   CIVIL ACTION NUMBER:
              Plaintiffs,       :
   vs.                          :
                               :   **No. 4:09-cv-1570**
WALMART STORES, INC. and        :
LOUISVILLE LADDER, INC.,        :
                               :
              Defendants.       :

## PLAINTIFFS BRIEF IN SUPPORT OF THEIR OPPOSITION TO DEFENDANT, LOUISVILLE LADDER, INC.'s MOTION FOR SUMMARY JUDGMENT

### I.    STATEMENT OF FACTS:

In or about the end of 2005, Plaintiff, Andrew Shecktor ["Shecktor"] purchased a sixteen [16] foot aluminum Louisville Ladder, Model No. L-2323-16.

The base section of the ladder has "shoes" on the bottom, which are attached to the ladder with a bolt in the rail which passes through a slot in the "shoe" to hold the "foot" of the ladder in place.  The ladder "foot" has a slot allowing the "foot" to move up and down on rail.  This slot was poorly engineered with a very loose fit.  The nut that holds the screw in place on which the "shoe" slides got caught in the slot, causing the "foot" to

1

lock in position, held only by friction.  While in use the forces exceed the friction holding the "foot" in place and cause the foot to abruptly fall to its resting position, and the ladder to shift accordingly.

On or about July 16, 2006, Shecktor used the ladder to cut dead branches from his 120 foot pine tree.  Mr. Shecktor had extensive experience utilizing a ladder and received training through the fire department during his training for a position as a volunteer firefighter.

Plaintiff correctly set-up the ladder, as taught by the Montgomery County Fire Academy in his basic firefighting classes and verified the feet were firmly planted, the ladder was correctly angled and the ground on which the ladder stood was solid.

Shecktor was on the ladder approximately twelve [12] feet high.  After releasing a branch with a weight of about thirty [35] pounds and the tool used to cut the branch to the ground, Plaintiff began to descend from the ladder.

Shecktor made his first step down the ladder and the left side of the ladder dropped about an inch as a result of the faulty design in the slot holding the "foot" of the ladder.  The slip in the slot holding the "foot" of the ladder caused the ladder to "jump" and bounce off the tree, at which point Shecktor was still attempting to descend down the ladder.  The ladder then began to fall to its left towards the concrete sidewalk.

Shecktor, realizing that falling with the ladder would probably result in serious injury as it seemed to be pushing him for a direct landing on his back onto the concrete, and out of fear, he let go of the ladder and made a drop to his feet, followed by a side roll as Shecktor was also taught at fire and rescue school.  Plaintiff was approximately twelve

2

[12] feet in the air at the time of the fall.  Plaintiff is unsure as to the length of time the event took; however, it happened very quickly and could have been a time span of approximately fifteen [15] seconds.

As a result of the accident caused by the faulty ladder, Shecktor broke his heals on both of his feet, along with numerous cuts and bruises.  Shecktor was in a wheelchair as both of his feet were in casts for eight [8] weeks followed by six [6] to twelve [12] weeks of physical and occupational therapy.  Shecktor was informed there was a fair chance that pain on extended walking or climbing could be permanent.  Unfortunately, Shecktor's pain has **not** subsided and Shecktor is unable to walk for periods of time and **cannot** climb ladders.

Shortly after Shecktor purchased his ladder and suffered injuries from the defective ladder manufactured by Louisville Ladder, Inc. ["LL" or "Defendant"], Defendant released an alternative design of the ladder and failed to recall Model number L-2323-16 or notify Shecktor of the instabilities.  The ladder's new "foot" design eliminated the slot, and thus the potential for failure.  Shecktor contends Defendant was well aware of the design flaw as evidenced by the design change shortly after Shecktor purchased the ladder.

For the reasons outlined herein and in the attached Exhibits, there are genuine issues of material fact in dispute and the Defendant is **not** entitled to judgment as a matter of law.  Thus, Defendant's Summary Judgment Motion must be Denied.

**ARGUMENT**

**II.   QUESTION INVOLVED:**

Have Plaintiffs established a prima facie cause of action for negligence against Defendant Louisville Ladder, where their expert states with certainty the defect in the ladder caused the incident and injuries sustained by Shecktor?

ANSWER:          Yes

**III.   LEGAL STANDARD FOR SUMMARY JUDGMENT:**

Summary judgment is appropriate when "there is no genuine issue as to any material fact," such that "the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing *Fed. R. Civ. P.* 56(c)). Summary judgment is the appropriate resolution of any action where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *See also Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3rd Cir. 1987).  In examining a Rule 56 motion, this Court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

To support denial of Summary Judgment, an issue of fact in dispute must be both genuine and material, *i.e.* one upon which a reasonable fact finder could base a verdict for

the non-moving party and one which is essential to establishing the claim. *Anderson* 477 U.S. 242 (1986) at 248.   When considering a Motion for Summary Judgment, the Court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id*.  The Court's consideration of the facts must be construed in the light most favorable to the party opposing Summary Judgment and all reasonable inferences from the facts must be drawn in favor of the opposing party, *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 180 (3rd Cir. 1999).

As this Court is aware, when a moving party has carried their burden under Rule 56(c), its opponent, Defendant herein, must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The non-moving party, as Plaintiffs herein have done, must respond to Defendant's Summary Judgment Motion "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F.3d 639, 643 n. 3 (3rd Cir. 1998), quoting *Fuentes v. Perskie*, 32 F. 3d 759, 762 n.1 (3rd Cir. 1994).

Here, Plaintiffs have clearly pointed out they purchased a ladder from Defendant which was defective.   Under Pennsylvania law, strict liability is imposed on the manufacturer of a product in a defective condition unreasonably dangerous to the user or consumer, *Incollingo v. Ewing*, 282 A.2d 206, 219 (Pa. 1971).  Defendant herein was

5

negligent in the design, sale and failure to warn Shecktor of the defect. With defective products, Pennsylvania has adopted the Restatement (Second) of Torts §402A(1), which imposes strict liability upon manufacturers of unreasonably dangerous products. RESTATEMENT (SECOND) OF TORTS §402a(1) (1965).

For the reasons outlined herein, Plaintiffs have met their burden and Defendant's Motion for Summary Judgment must be Denied.

## IV. THE LOUISVILLE LADDER MODEL L-2323-16 WAS DEFECTIVE THEREBY CAUSING ANDREW SHECKTOR'S INJURIES:

Defendant in their Summary Judgment Brief at page 5, ¶4 and page 6, ¶1 stated that Shecktor testified the ladder moved to the left which is an indication of instability. Defendant leaves out the very important part that before the ladder slid to the left, the ladder fell backwards where the feet were.

Shecktor retained the services of an Engineering Expert, Richard T. Hughes ["Hughes"], regarding the design and safety of the Louisville Ladder Model L-2323-16. Mr. Hughes opined that Mr. Shecktor was **not** doing anything unusual or dangerous with the ladder. *See* Hughes report attached hereto and incorporated in by reference as **EXHIBIT "A"**, page 3, ¶3. Mr. Hughes opined that the slotted bolt hole in the "shoe" of the ladder allowed for improper slope of the ladder in addition to for additional horizontal force on the bearing instead of vertical force on the bearing in the event that the ladder started to move. *See* **EXHIBIT "A"**, page 3, ¶4; and the fact that Defendant eliminated the defect approximately two [2] years after the incident, but failed to send any type of

6

recall to Mr. Shecktor, **EXHIBIT "A"**, page 3, ¶4; Hughes opined the defect in the "shoe" of the ladder was a known hazard and the primary cause of the injuries sustained by Mr. Shecktor, **EXHIBIT "A"**, page 3, ¶5.

Hughes was deposed by Defendant on July 12, 2011. *See* a copy of Mr. Hughes testimony transcript attached hereto and incorporated in by reference as **EXHIBIT "B"**. Hughes during his testimony continued stating that the bottom of the ladder "kicked out" causing Mr. Shecktor to fall.  Counsel for Defendant read parts of a testimony transcript of Mr. Shecktor to Mr. Hughes during the deposition.  Defendant through counsel left out important parts of the testimony.  Michael Kunsch, Esquire, Counsel for the Defendant, read to Mr. Hughes that Mr. Shecktor testified that the left side of the ladder dropped about one to two inches and then fell to the left. *See* **EXHIBIT "B"** at page 99, lines 4-9 and lines 14-21.  Mr. Kunsch further read that after Shecktor cut the branch, the branch fell and caught the pruning device, which caused the ladder to sway to the left.  Based on that, Mr. Kunsch was asking for a statement from Hughes that the sway to the left indicated the ladder was unstable and therefore not faulty.  Mr. Kunsch further asked if Shecktor's testimony changed Hughes opinion. *See* **EXHIBIT "B"**, page 99, lines 14-25; pages 100-110, lines 1-25; and page 111, lines 1-6.  Hughes stated he must read the entire deposition testimony of Mr. Shecktor prior to answering the question definitively. *See* **EXHIBIT "B"**, page 107 lines 20-24; and page 108, lines 6-7.

After his deposition, Hughes read Shecktor's deposition testimony in its entirety. After which Mr. Hughes sent a supplemental to his report by way of letter dated july 21, 2011to Philip J. Berg, Esquire, counsel for Andrew Shecktor. *See* **EXHIBIT "C"**.

Hughes in his supplement to his report states:

"During my deposition on July 12, 2011, the defense counsel, Mr. Michael Kunsch asked specific questions with regards as how the ladder fell off the tree. Mr. Kunsch quoted from Mr. Shecktor's sworn testimony that the ladder fell sideways to the left and then struck the ground. Kunsch asked me if this would alter or change my opinions based on this information. My opinions were based on the base of the ladder moving initially outward. While Mr. Kunsch quoted from Shecktor's deposition he never mentioned Shecktor's statement which followed the side sway testimony."

"On page 86 of Shecktor's deposition he describes the initial movement of the ladder before his fall; 'As I made my first step down, the ladder, the left side of the ladder dropped about an inch maybe two inches and destabilized me'. On page 89, Mr. Shecktor stated, 'It fell kind of backwards to where the feet were'. This is consistent with my opinion of the flawed slot design causing the problem wherein it can cause horizontal loads. This is important because this indicates that the base of the ladder slid backwards first, then it fell off the tree. The drop of an inch or two as Shecktor describes would be the downward movement available in the cleat shoe due to the 1-1/2 inch vertical slot as shown in Louisville Ladder shop drawing F-1825 as drawn in the year 2002 (See attached)."

"Based on a review of the shop drawings and Shecktor's sworn testimony my original opinion remained unchanged; the cleat design is flawed and caused instability in the ladder."

Therefore, Plaintiffs have inter alia established a basis on which the jury could find that defect in the ladder caused the accident and Defendant's Summary Judgment Motion must be Denied.

**V.**     **CONCLUSION:**

For the foregoing reasons, Defendant, Louisville Ladder, Inc.'s Motion for Summary Judgment must be Denied.

Respectfully submitted,

Dated:  October 4, 2011                        _____
Philip J. Berg, Esquire
Pennsylvania I.D. 9867
LAW OFFICES OF PHILIP J. BERG
555 Andorra Glen Court, Suite 12
Lafayette Hill, PA 19444-2531
Telephone:   (610) 825-3134
E-mail: philjberg@gmail.com

*Attorney for Plaintiffs Andrew Shecktor and Jean Marshman*

# EXHIBIT "A"

Investigation into Ladder Accident

At

1308 Fairview Ave
Berwick, Pennsylvania

Mr. Andrew Shecktor

March 8, 2011



*Richard T. Hughes, P.E.*
*Consulting Engineer*
107 N. Front Street
Clearfield, Pa. 16830
(814) 765-8691
www.hughesengineering.net

Investigation into Ladder Accident

At

1308 Fairview Ave
Berwick, Pennsylvania

Mr. Andrew Shecktor

March 8, 2011



*Richard T. Hughes, P.E.*
*Consulting Engineer*
107 N. Front Street
Clearfield, Pa. 16830
(814) 765-8691

# INDEX

SUMMARY...........................................i

1.0 BACKGROUND.........................1

2.0 INVESTIGATION ....................2

3.0 CONCLUSIONS........................3

4.0 REFERENCES .........................4

5.0 VITAE .......................................5

# SUMMARY

On the afternoon of July 16, 2006, Mr. Andrew Shecktor fell off an extension ladder that was resting on a tree at 1308 Fairview Avenue in Berwick, Pennsylvania, resulting in serious injury.

The results of this investigation revealed that the support shoes at the base of the ladder had slots in them which made the ladder unstable and were the direct cause of the injuries sustained by Mr. Shecktor.

# 1.0 BACKGROUND

On the afternoon of July 16, 2006, 49-year-old Andrew Shecktor was working on a Louisville extension ladder in his yard with a pruning clipper. He had extended the 16 foot ladder upwards 12 feet and was 9 feet from the top, standing, about to descend when the one side of the ladder slipped causing the ladder to fall to the ground. Mr. Shecktor felt the base of the one leg move backward just before the fall. He was seriously injured due to the incident.

In March 2011, Mr. Philip Berg, legal counsel for Mr. Shecktor, retained the services of Richard T. Hughes, P.E. to determine if the shoes on the base of the ladder were safe and whether they were the cause of the fall. As part of this investigation Mr. Berg supplied to Mr. Hughes photos of the area taken the day after the incident, photos of the ladder and photos of the revised shoe which has been placed on all newer versions of this type of ladder by Louisville.

## 2.0 INVESTIGATION

The exact location of this incident was in the yard of Mr. Shecktor's residence at 1308 Fairview Avenue, Berwick, Pennsylvania. According to Mr. Shecktor the lawn and tree have not been altered since the incident.

Mr. Shecktor was 49 years old at the time and weighed approximately 150 pounds. He had a tree shear trimmer in his hand and had used the ladder several times before this incident. He was trimming limbs on the tree at the time of the incident.

The ladder was an 16 foot, aluminum, extension ladder manufactured by Louisville Ladder Company and was model L-2323-16 manufactured in January 2005. Mr. Shecktor had purchased the ladder at a nearby Home Depot Store within the last year. At the time of the incident it was extended 12 feet and was resting on the tree at the top and on the dry dirt on the ground. Mr. Shecktor said he was not leaning but rather starting to descend the ladder when the bottom kicked out. He stated his feet were approximately 9 feet off the ground. Mr. Shecktor stated that he had the base of the ladder no farther than three to four feet from the base of the tree. This would be approximately 75 degrees (within regulation). There were no witnesses to the incident.

A close up inspection of the shoes on the base of the ladder rails revealed that a single bolt in a slot allows the shoe to swivel to meet the uneven contact surfaces. The base of the aluminum shoes consist of a piece of neoprene rubber to increase the traction or slip resistance. If the shoe is bolted to the base of the rail without a slot, it limits the amount of rotation and in essence fixes the proper slope of the ladder, whereas if the shoe has a slot it allows the user to erect the ladder at any angle. And if the shoe starts to move or slip regardless of bolt pattern the slotted connection only compounds the problem while the single hole will direct the shoe to "dig in". It should be noted that since 2007 the same ladders manufactured by Louisville Ladder Company have discontinued the use of slotted bolt holes on the shoes; unfortunately this design change was not conducted on Mr. Shecktor's ladder.

**Discussion**

Thousands of people become injured each year in this country from reckless use of ladders. OSHA Code has strict regulations with regards to the use of extension ladders. The pitch or slope of the ladder must not be less than 75 degrees; in this instance the ladder rails were both supported by the two (2) foot diameter pine tree [1926.1053 (b) (10)], and the base of the ladder was out from the base of the tree approximately three to four feet. The ladder should be placed on a level surface [1926.1053(b) (6)], and it should never be placed on a slippery surface [1926.1053 (b) (7)].

2

# 3.0 CONCLUSIONS

Based on the physical evidence at the site, a review of industry standards, the photos, the modified ladder shoe, a statement from Mr. Shecktor plus my own publication and experience with dozens of similar accidents, it is my professional opinion with high degree of engineering certainty that:

1.  Mr. Andrew Shecktor was injured on July 16, 2006, at 1308 Fairview Avenue in Berwick while attempting to descend an extension ladder;

2.  Mr. Shecktor was not doing anything abnormal at the time of the incident;

3.  The slotted bolt hole in the shoe allowed for improper slope of the ladder plus it allowed for additional horizontal force on the bearing instead of vertical force on the bearing in the event that it started to move;

4.  The manufacturer eliminated this defect approximately two years later, yet Mr. Shecktor's ladder was not recalled;

5.  The defective shoe was a known hazard and the primary cause of the injuries sustained by Mr. Shecktor.

# 4.0 REFERENCES

# EXHIBIT "B"

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE
2                MIDDLE DISTRICT OF PENNSYLVANIA
3                            - - -
4

ANDREW M. SHECKTOR and        :   CIVIL ACTION
5   JEAN B. MARSHMAN           :
                              :   NO. 209-CV-466-JS
6      VS.                     :
                              :
7   LOUISVILLE LADDER, INC.    :
8
9                          - - -
                    TUESDAY, JULY 12, 2011
10                         - - -
11          Oral deposition of RICHARD T. HUGHES,
    taken pursuant to notice, was held at 107 N. Front
12   Street, Clearfield, PA  16830, commencing at 9:47
    a.m., on the above date, before Laura Marie Bruner,
13   Notary Public in and for the Commonwealth of
    Pennsylvania.
14
15                          - - -
16
17
18
19
20
21
22
23
24          VERITEXT COURT REPORTING COMPANY
             1800 Market Street, Suite 1800
25              Philadelphia, PA  19103

Page 2

1    A P P E A R A N C E S:

2    LAW OFFICES OF PHILIP J. BERG

      BY:   PHILIP J. BERG, ESQUIRE

3    555 Andorra Glen Court, Suite 12

      Lafayette Hill, PA  19444

4    (610) 825-3134

      philjberg@gmail.com

5    Representing the Plaintiffs

6

7    SWEENEY & SHEEHAN

      BY:   J. MICHAEL KUNSCH, ESQUIRE

8    1515 Market Street, 19th Floor

      Philadelphia, PA  19102

9    (215) 963-2481

      michael.kunsch@sweeneyfirm.com

10   Representing the Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X
2                      - - -
     Testimony of:  Richard T. Hughes
3      By Mr. Kunsch . . . . . . . . . . 5
4                      - - -
5                 E X H I B I T S
6                      - - -
7     EXHIBIT NUMBER         DESCRIPTION        PAGE MARKED
8
9        1          2-PAGE AMENDED NOTICE        9
                    OF DEPOSITION
10
11       2          17 PAGE 3/8/11               12
                    SHECKTOR INVESTIGATION
12
13       3          2 PAGES OF COLOR             31
                    PHOTOCOPY 4X6 PHOTOGRAPHS
14
15       4          5-PAGE 4/14/11 CONFIDENTIAL 38
                    PROPERTY OF HUGHES, P.E.
16
         5          4-PAGE 7/11/11 TESTIMONY     38
17                  LOG OF HUGHES, P.E.
18       6          PAGES 482 & 483/CHAPTER 30  49
                    OF "LADDERS, SCAFFOLDING
19                  AND PLATFORMS"
20       7          30 PAGES OF NOTES            50
                    & INFORMATION
21
         8          2-PAGE OF 7/12/11            57
22                  CONFIDENTIAL PROPERTY
                    OF HUGHES, P.E.
23
24
25
```

1             DEPOSITION SUPPORT INDEX

2     Direction of Witness Not to Answer

      Page Line

3     (None)

4

      Request For Production of Documents

5     Page Line

      16/19

6

7     Stipulations

      Page Line

8     5

9     Questions Marked

      Page Line

10    (None)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (It is hereby stipulated and agreed by

 2      and among counsel for the respective parties

 3      that reading, signing, sealing, certification and

 4      filing are waived and that all objections,

 5      except as to the form of the question, be

 6      reserved until the time of trial.)

 7                        - - -

 8              RICHARD T. HUGHES, PE, after having

 9          been first duly sworn, was examined

10          and testified as follows:

11                        - - -

12                     EXAMINATION

13                        - - -

14  BY MR. KUNSCH:

15      Q    Good morning, Mr. Hughes.  My name is

16  Michael Kunsch.  I am an attorney who represents

17  Louisville Ladder in a lawsuit that's been brought by

18  Andrew Shecktor and Jean Marshman arising out of an

19  incident which occurred several years ago.  You have

20  been identified as an expert witness on behalf of the

21  Plaintiff, and I received a report that you prepared.

22  We're here to take your deposition.  We're going to

23  talk about your testimony in a little while, but --

24  your testimony live in a little while.  But the first

25  question is, you've been deposed before?
```

1     A   Yes.

2     Q   Okay.  You understand the ground rules for

3 depositions.  I'm going to be very brief in my

4 instructions to you.  If you have any questions at

5 any time, you can ask me.  All right?

6     A   Yes.

7     Q   There's a court reporter seated to my right

8 and your left.  She's going to take down everything

9 that's said today.  For her to do her job, we have to

10 cooperate just a little bit.  First off, all of your

11 responses need to be verbal, yes or no or an

12 explanation or whatever the question calls for.  Do

13 you understand that?

14    A   Yes.

15    Q   All right.  At any time if I ask you a

16 question that you don't understand, please tell me

17 you don't understand it, and I'll rephrase it for

18 you.  Do you understand that?

19    A   Yes.

20    Q   All right.  If at any time I ask you a

21 question and you don't know the exact answer but can

22 give us an approximation, we appreciate that you want

23 to give us an approximation.  We just ask you to tell

24 us that you're approximating.  Okay?

25    A   Yes.

1      Q     At any time you need to take a break for
2   any reason, please let us know.  We'll go off the
3   record and take a break.  Do you understand that?
4      A     Yes.
5      Q     Are you under the effect of any medication,
6   or is there any reason that you can't understand my
7   questions and give truthful testimony today, sir?
8      A     No.
9      Q     Okay.  Where are we here today, sir?
10     A     107 North Front Street, Clearfield
11  Pennsylvania.
12     Q     And what is this location, sir?
13     A     It's my offices, which is Hughes
14  Engineering.
15     Q     And what is the business of Hughes
16  Engineering?
17     A     We're consulting engineers.  The firm has
18  been in existence for, I think, 15, 16 years now.
19     Q     And what is your interest in Hughes
20  Engineering?
21     A     The president and the owner.
22     Q     Okay.  And how many employees do you have?
23     A     Four.
24     Q     Are there any engineers other than you?
25     A     Yes.

Page 8

1       Q       And how many?

2       A       One.

3       Q       And what is the field of expertise of that

4    engineering?

5       A       Architectural engineering.

6                               - - -

7               (Discussion held off record.)

8                               - - -

9    BY MR. KUNSCH:

10      Q       And what is the business of Hughes

11   Engineering?

12      A       For the last 30 years, I have been

13   designing buildings and infrastructure projects,

14   office buildings, bridges, all type of infrastructure

15   projects.  For the last approximately 20 years, I've

16   also been doing forensic work which would include

17   people getting hurt and killed in their own

18   buildings.  I also do a lot of work for insurance

19   companies, going out and looking at problem

20   structures, whether they were hit with a tornado, a

21   wind storm, collapsed under the weight of ice and

22   snow, hit with an automobile, problem buildings, or

23   if there's a building that they don't understand what

24   -- what the problem is, they'll give me a call to

25   take a look at it.

Page 9

1       Q     Okay.  In preparation for the deposition

2   today, did you meet Mr. Berg?

3       A     Yes.

4       Q     You've met with Mr. Berg before?

5       A     Only on phone conversations.

6       Q     Okay.  Phone conversations.  Okay.  I'm

7   going to show you something which I've marked Hughes

8   1, sir.  It's the notice for today's deposition.

9   Have you seen that notice before, sir?

10                      - - -

11          (Whereupon the Amended Notice of Deposition

12   was marked, for identification purposes, as

13   Exhibit Number 1.)

14                      - - -

15       A     I don't recall, but I have it marked today,

16   and I'm here today.  So I'm guessing that I've --

17   BY MR. KUNSCH:

18       Q     There are a list of nine items that you

19   were to bring to the deposition.  Please review that

20   list and tell me if we have all those things here

21   today.

22       A     I'd have to look here.

23       Q     Okay.

24       A     8 and 9, your Rule 26 testimony log, I

25   don't know what that means.  I'm an engineer, and the

1   other one is your current fee schedule.  I don't

2   charge by the hour.  I charge by the assignments.

3        Q    You do.  And what was your charge for this

4   assignment?

5        A    2500.

6        Q    And is that a rate for any assignment, or

7   do you classify them in some fashion?

8        A    I've been -- when I work for insurance

9   companies and I go out and look at a case, I

10  typically do it by the mileage, in other words, the

11  distance.  If it's an hour away, I charge a certain

12  amount, if it's two, three hours away.  So it's a

13  function of the business, primarily that.  You know,

14  distance is the biggest issue.

15       Q    Did you go to the scene of this incident?

16       A    No, I didn't.

17       Q    Was distance a relevant consideration in

18  determining what you were going to charge for this

19  assignment?

20       A    I've always considered -- I've always had

21  it in the case that I would be going out there,

22  possibly going out, not necessarily, but possibly

23  going out, yeah.

24       Q    And the location is Berwick?

25       A    Yes.

1     Q    Okay.  And that was the factor in quoting

2   Mr. Berg the fee of $2500?

3     A    Yes.  If it was New York City, Charleston,

4   West Virginia, Cleveland or Philadelphia, it would

5   have been more.  If it was State College, Erie, it

6   would be less.

7     Q    It would be less.  What's the smallest fee

8   that you charge?

9     A    For insurance assignments, my fees to go

10  out and look at something here in town would be,

11  like, $650.

12    Q    Okay.  Your testimony log is what appears

13  to be what you provided to Mr. Berg's office

14  yesterday.  You were asked to provide a list that

15  identified cases in which you have testified by case

16  name and civil action number.  Do you understand

17  that?  You were asked to prepare such a document?

18    A    Yes.

19    Q    Have you ever testified in federal court

20  before?

21    A    Yes.

22    Q    Okay.  You've never been asked to provide a

23  Rule 26 testimony log?

24    A    I have been asked to provide a log like

25  that many times.  I have produced that log many times

Page 12

1     without incident, probably ten times.

2          Q    Okay.  Other than that, all the documents

3     that are requested in Hughes 1 are with you and in

4     front of you right now?

5          A    Yes.

6          Q    I'm going to show you a document,

7     Mr. Hughes, which I'm going to mark as Hughes 2.  I

8     want you to take a look at that, sir, and would you

9     agree we me, sir, that that's a copy of your March 8,

10    2011, report in this case?

11                         - - -

12         (Whereupon the 3-8-11 Shecktor

13    Investigation was marked, for identification

14    purposes, as Exhibit Number 2.)

15                         - - -

16         A    Yes.

17    BY MR. KUNSCH:

18         Q    And it includes a section you call

19    references and, in addition, your Curriculum Vitae

20    which is in the back?

21         A    Yes.

22         Q    All right.  Sir, is that the only report

23    that you've authored in this case?

24         A    Yes, sir.

25         Q    And does that report contain a complete

1   statement of all of the facts upon which your

2   opinions are based?

3       A     Unless something is asked of me today, yes.

4       Q     And does that report contain a complete

5   statement of all of your opinions in this matter?

6       A     Unless -- again, unless something is asked.

7       Q     Okay.  What I'd like to do first, sir, is

8   to go through your file that I took a look at prior

9   to the deposition which you brought with you today,

10  and I'm going to walk you through it and then we'll

11  mark some documents.  How does that sound?  Okay?

12      A     Okay.

13      Q     You have a copy of your report in your

14  file?

15      A     Yes.

16      Q     You have a May 22nd letter from you to

17  Mr. Berg?

18      A     Yes.

19      Q     Okay.  There is a May 25th letter from

20  Mr. Berg to you?

21      A     Yes.

22      Q     There is your $2500 invoice dated March 8,

23  2011; is that correct?

24      A     Yes.

25      Q     You do not have detailed time records?

1      A     No.

2      Q     Let me ask that question so it's clear on

3  the record.  Do you have detailed time records for

4  the time that you spent on this case?

5      A     No.

6      Q     Okay.  There is an invoice for your

7  deposition today, and you have $500; is that correct?

8      A     Yeah.

9      Q     And I gave you a check prior to this

10  deposition; is that right?

11      A     Yes.

12      Q     There are some emails between you and

13  Mr. Berg's office about the deposition today?

14      A     Yes.

15      Q     There is a faxed letter to you from

16  Mr. Berg dated May 20th, 2011?

17      A     Yes.

18      Q     And this is -- attached to that is an

19  Amended Notice of Oral Deposition when the deposition

20  was initially scheduled for May 24th; is that right?

21      A     Correct.

22      Q     And other than the date and time -- if you

23  want to review this, you can -- it's exactly the same

24  as the one I showed you today, correct?

25      A     Correct.

1      Q    Does that refresh your recollection that

2  you've seen that Notice before?

3      A    Yes.

4      Q    Let's talk about this one last.  There is a

5  set of color copies of photographs of Mr. Shecktor's

6  house and the ladder in question.  Do you agree with

7  me about that?

8      A    Yes.

9      Q    Did you take those pictures?

10      A    No.

11      Q    Were they provided to you by Mr. Berg?

12      A    Yes.

13      Q    Do you know when they were taken?

14      A    No.

15      Q    Were they taken after you wrote your

16  report?

17      A    I am under the assumption they were because

18  they were produced to me after my report was

19  developed.

20      Q    For the record, these are a set of pictures

21  that were taken by Mike Van Bree, I believe, in

22  May of 2011.  The last set of documents, sir, is a

23  set of documents marked Shecktor LLG 0001 to

24  Shecktor LLG 0092; is that correct?

25      A    Yes.

1      Q      Were you provided these prior to authoring

2   your report in this case?

3      A      No.

4      Q      When were you provided those records?

5      A      Afterwards.  I don't know what date it was.

6      Q      Several of those records are marked

7   confidential.  Do you see that?

8      A      Yes.

9      Q      Were you provided with a copy of the

10  confidentiality and protective order that's in place

11  in this case?

12     A      No, not that I'm aware of.

13     Q      You were not asked to sign that

14  confidentiality order despite the requirements of

15  that order which require Mr. Berg to show you that

16  document and have you execute it prior to seeing any

17  confidential documents?

18     A      No.

19            MR. KUNSCH:  I'd ask you to take care of

20  that.

21            MR. BERG:  Okay.

22  BY MR. KUNSCH:

23     Q      There's a page called, According to Andrew.

24     A      Yes.

25     Q      When were you provided with that document?

Page 17

1       A    I don't know.

2       Q    Was it prior to or after the issuance of

3  your report?

4       A    I don't recall.  You know, I work on dozens

5  of, not litigation cases, but inspections, and I

6  don't -- I don't pay that close attention to --

7       Q    Did you author that document?

8       A    No.

9       Q    There's some handwriting at the bottom of

10  that.  Is that your handwriting?

11      A    Yes.

12      Q    Okay.  And what does your handwriting say?

13      A    It says, ended up on concrete.

14      Q    Okay.  And do you remember when you wrote

15  that?  Was it prior to your actual issuance of your

16  report?

17      A    No, I don't pay attention to that.

18      Q    Okay.  There is a paperclipped stack of

19  documents which begins with --

20      A    I don't think this is --

21      Q    We'll make sure that's clear for the

22  record.  I'm going to mark a copy of this one.

23      A    Okay.

24      Q    But there are two pages of notes.  Are

25  those in your handwriting?

1      A      Yes, they are.

2      Q      And on the back of the first page, there's

3   a picture of a gas station of some sort.  Do those

4   notes have anything to do with -- I believe you might

5   say that -- you might want to take a look at those

6   notes and tell me if they have anything to do with

7   this.

8      A      I don't think they have anything to do with

9   it.

10     Q      In addition to the pages of notes, there

11  are -- there's a picture of the foot mechanism for

12  this ladder; is that correct?

13     A      Correct.

14     Q      And it says, rivets on it?

15     A      Correct.

16     Q      Is that a picture you took?

17     A      No.

18     Q      Did you take any pictures?

19     A      No.

20     Q      There's a drawing here of the -- which

21  purports to be of the foot mechanism.  Is that your

22  drawing?

23     A      Yes.

24     Q      There is a fax from Mr. Shecktor to his

25  attorney dated May 21, 2007, which was marked

1  Shecktor 24, which is 2 pages.  There's a picture on

2  the second page of that which says, defective shoe.

3  Did you write that?

4       A    Yes.

5       Q    And there's several other pictures.  It

6  looks like exhibits from Mr. Shecktor's deposition,

7  and it looks like at least some photographs and

8  emails between you and Mr. Berg; is that correct?

9       A    Correct.

10       Q    There are some pictures here that were

11  taken, I believe, at a Home Depot.  Those pictures

12  were provided to you?

13       A    Yes.

14       Q    Did you ever look at the ladder at issue in

15  this case?

16       A    No.

17       Q    I'm going to get back to this.

18                         - - -

19            (Discussion held off record.)

20                         - - -

21  BY MR. KUNSCH:

22       Q    You have also shown -- you've also put here

23  in front of us a copy of a book that you wrote in

24  conjunction with David MacCollum, Building Design and

25  Construction Hazards.  That's actually referenced in

Page 20

1    your report; is that correct?

2         A    Yes.

3         Q    This book?  All right.  And you've given me

4    a -- the cover -- copy of the cover of the book; is

5    that correct?

6         A    Correct.

7         Q    Is this book still available for purchase?

8         A    Yes.

9         Q    And where can you purchase it?

10        A    At the publishing company.

11        Q    At the Lawyers & Judges Publishing Company?

12        A    Yes.

13        Q    And this was published in 2005?

14        A    Yes.

15        Q    And who is David MacCollum?

16        A    David MacCollum is a gentleman, an engineer

17   from the State of Arizona whose expertise is

18   primarily in cranes.

19        Q    If you could -- I don't know if I've asked

20   you this question or not -- but have we covered your

21   entire file regarding this matter, what we've just

22   described on the record as your entire file?

23        A    Yes.

24        Q    Okay.  If you could, sir, turn to the

25   Curriculum Vitae which is attached to the -- if you

1    need another copy, there's another one here.  It's on

2    Exhibit 1.  Can you confirm for us today, sir, that

3    the Curriculum Vitae which was attached to your

4    report which was marked as Hughes 2, is a true and

5    correct copy of your current curriculum vitae?

6         A    This CV shows the last projects that I have

7    designed are in 2002, and I actively design buildings

8    and infrastructure projects today.  So the only thing

9    that would be missing on here would be additional

10   projects.  Other than that, it's -- and the reason

11   they're not on there, I don't have an answer.

12        Q    Okay.  Is there an updated CV which would

13   contain these additional projects, or is this your

14   current CV?

15        A    This is my current one.

16        Q    Okay.  But the only additions if you were

17   to sit down and take the time to redo your CV today

18   would be additional buildings that you've

19   participated in the design and construction of?

20        A    And additional inspections that I've done.

21   I've done as many as, you know, hundreds of

22   inspections for insurance companies on defective

23   buildings and litigation.  There's been litigation in

24   the last, you know, this year, I guess you would say.

25        Q    You're a graduate of Penn State?

1        A     Yes.

2        Q     Your degree is in what?

3        A     I have two degrees, one in civil

4    engineering and one in engineering science.

5        Q     And civil engineering is what, sir?

6        A     Civil engineering encompasses the design of

7    infrastructure projects, water, sewer, bridges,

8    buildings, geotechnical issues, surveying.  It's a

9    pretty broad spectrum of engineering.

10       Q     What is mechanical engineering?

11       A     Mechanical engineers design heat systems.

12   They design mechanical parts for different structures

13   and things like that.  Within each branch, there's

14   overlaps.  An engineering science degree sort of

15   covers all of them.  It's a degree that I -- I have

16   to take classes in mechanical, electrical, industrial

17   and all that.  Each discipline, electrical engineers

18   is a little different than mechanical engineers, is

19   different than civil engineers.

20       Q     Okay.  No disrespect.  And you can answer

21   questions whatever way you want.  But I'm going to

22   keep asking you questions today.  If you don't stick

23   to answering the questions, we're going to be here

24   all day.  Okay?  So like I said, I can't stop you

25   from answering; but I'm going to give you a chance to

1   answer all the questions you want to.  I promise.

2   All right?

3        A    Yes.

4        Q    So the question was, What is mechanical

5   engineering?

6        A    Well, mechanical engineering is the --

7   mechanical engineering take the same fundamental

8   courses that all engineers take.  Engineering

9   mechanics, they just -- they study fluid flows, a lot

10  of what we do, but then they get off on different

11  things.  I'm not a mechanical engineer, but they --

12  but they design air conditioning systems, heating

13  systems.  They design mechanical devices.  I think a

14  lot of people think of them as in the air and space

15  industry and also in the automotive industry.  They

16  do a lot of that stuff.

17       Q    They also design products?

18       A    Yes.

19       Q    Okay.  And what is engineering science?

20       A    Engineering science is an honors program at

21  Penn State that covers all the disciplines.  In other

22  words, to get the degree, you have to take graduate

23  level courses in mechanical, electrical, industrial

24  engineering, primarily those three.

25       Q    You're a registered or a licensed

1    professional engineer in Pennsylvania?

2         A    Yes.

3         Q    And that's since 1987?

4         A    Yes.

5         Q    Okay.  And a number of other states as well

6    as listed in your CV?

7         A    Yes.

8         Q    Is that list current?

9         A    Yes.

10        Q    Did you write a master's thesis?

11        A    Two of them.

12        Q    Two of them.  What were the subjects of

13   your master's theses?

14        A    The topics in my master's theses were in

15   design of wood structures, and the other one was in

16   the design of concrete, concrete and wood.

17        Q    Your CV contains a list of publications,

18   buildings that you've -- or books and articles that

19   you've written; is that correct?

20        A    Yes.

21        Q    The publication that we see here, Building

22   Design and Construction Hazards, is not on this.  If

23   you look at the last page.

24        A    It's Number 5.

25             MR. KUNSCH:  It is.  Oh, I'm sorry.  Off

1   the record.

2                              - - -

3                   (Discussion held off record.)

4                              - - -

5   BY MR. KUNSCH:

6        Q     Are there any publications that are not on

7   this list?

8        A     Not that I'm aware of.

9        Q     Do you have any other certifications?

10       A     No.

11       Q     Have you ever worked for a standards

12  organization such as UL, ASTM, ANSI, or others?

13       A     No.

14       Q     Have you ever sat on a standards making

15  committee or body?

16       A     I've been an advisor to one.

17       Q     Which one?

18       A     With the Hazard -- the Hazard Information

19  Foundation Institute was a group that was -- a

20  foundation set up to advise engineers on different

21  issues, safety issues.  I sat on that for probably

22  five years.

23       Q     When was that?

24       A     That would have to be from about 19 -- or

25  excuse me -- 2003 to 2008, approximately.

1        Q     Are there standards that govern

2   investigation or testing or rendering opinions in

3   your area of expertise?

4        A     Yes.

5        Q     And who promulgates those standards?

6        A     It depends on what the item is.

7        Q     Well, for a ladder.

8        A     For ladders, there's a -- the ladder

9   industry has their own institute which they all

10  belong to.  They're big manufacturers.  Plus OSHA has

11  stipulated regulations on ladders as well.

12       Q     Are there any standards governing forensic

13  civil engineering?

14       A     No.

15       Q     Do you believe you bring anything unique or

16  special technical or scientific knowledge to this

17  case beyond that of a layman?

18       A     Yes.

19       Q     Do you consider each area of expertise to

20  be based upon scientific knowledge?

21       A     Yes.

22       Q     In what areas do you consider yourself an

23  expert?

24       A     Structural engineering.

25       Q     Anything else?

1      A     Well, structural engineering is part of

2  civil engineering.  So in this avocation, structural

3  engineering.

4      Q     Do you have any formal training in the

5  design or manufacture of household products or

6  consumer goods?

7      A     No.

8      Q     Have you ever designed any household

9  products or their components?

10     A     No.

11     Q     Have you ever designed a ladder, scaffold,

12  or the components for one of those?

13     A     No.

14     Q     Do you hold any patents?

15     A     No.

16     Q     Have you ever designed any products that

17  received a UL listing?

18     A     No.

19     Q     Have you ever worked for a manufacturer of

20  household products?

21     A     No.

22     Q     Have you ever worked for a manufacturer of

23  ladders or their components?

24     A     Not that I recall.

25     Q     Have you ever taught in the field of

1    engineering?

2        A    No.

3        Q    Do you speak in the area of structural

4    engineering?

5        A    Yes.

6        Q    Where?

7        A    I've given talks at the Hazard Information

8    Foundation's conferences and Construction Safety

9    Council conferences.

10       Q    Anything else?

11       A    No.

12       Q    Do you have a list of your speaking

13   engagements anywhere?

14       A    No.

15       Q    Other than the publications that are

16   contained in your CV which we discussed briefly, have

17   you written any other articles or books?

18       A    No.

19       Q    Okay.  Have you ever published in any

20   publication any tests, theories, or other facets of

21   your opinions relevant to this case?

22       A    No.

23       Q    Do you participate in editing any peer

24   review journals?

25       A    No.

1      Q    Do you subscribe to any magazines,

2  journals, or other sources in the area of product

3  design or ladders?

4      A    No.

5      Q    Do you consider ANSI A 14.2 authoritative?

6      A    Yes.

7      Q    Is there anything else that you consider

8  authoritative in the design of ladders such as the

9  one at issue in this case?

10     A    No.

11     Q    Is there anything else that you consider a

12  reliability authority regarding the design or

13  manufacture of ladders?

14     A    No.

15     Q    Have you done any research relevant to the

16  opinions that you're offering in this case?

17     A    I analyzed the -- studied the situation.

18     Q    Other than for the specific facts of this

19  case?

20     A    No.

21     Q    Have you done any research germane to the

22  opinions you're providing?

23     A    I've looked at the design, the cleat design

24  of other manufacturers and other ladders.  I've done

25  that.

1      Q      When did you do that?

2      A      Prior to developing the report.

3      Q      Where did you go to look at these?

4      A      Various locations I looked, people that had

5  ladders, a store, Lowe's, that would sell different

6  ladders, different hardware stores to look at the

7  different cleats on the bottom of ladders.

8      Q      Did you purchase any of those ladders?

9      A      No.

10      Q      You didn't take any pictures of them?

11      A      I may have pictures, but I didn't put them

12  in my file.  I may have taken a picture when I was

13  there.  I'd have to go look.

14      Q      Where would you go to look?  We're in a

15  conference room that's right next to your office.

16      A      Yes, I would have to look on my computer.

17      Q      How long would that take?

18      A      Five minutes.

19      Q      Why don't you go do that?

20                      - - -

21          (Whereupon there was a recess in

22      the proceedings.)

23                      - - -

24  BY MR. KUNSCH:

25      Q      Mr. Hughes, you've provided me with, I

1  believe, four pictures on two sheets of paper.  These

2  are photographs that you took?

3      A     Yes.

4      Q     And where did you take them?

5      A     Those were taken at Lowe's.

6      Q     And were they taken prior to authoring your

7  report in this case?

8      A     Yes.

9      Q     And they are photographs of ladders that

10  were on sale at Lowe's when you went there?

11      A     Yes.

12      Q     Okay.  I'm going to mark those photographs

13  as Hughes 3, and we'll mark them Page A and Page B.

14  I'll put those aside.  Have you been a member of the

15  American Society of Mechanical Engineers?

16                      - - -

17          (Whereupon the Color Photocopies of 4X6

18  Photographs were marked, for identification purposes,

19  as Exhibit Number 3.)

20                      - - -

21      A     No.

22  BY MR. KUNSCH:

23      Q     Have you been a member of the American

24  Academy of Forensic Sciences?

25      A     No.

1      Q      Have you ever been a member of ANSI or any

2  of its committees?

3      A      No.

4      Q      Have you ever been a member of ASTM or any

5  of its committees?

6      A      No.

7      Q      Have you ever been the subject of

8  professional discipline?

9      A      No.

10      Q      Your CV indicates that you began forensic

11  -- well, strike the question.  When did you first

12  start doing forensic engineering?

13      A      Probably in the first or second year I got

14  out of school working for various companies where we

15  had problems, structural issues on a building, if we

16  had a structural issue on a building, you know, like

17  a weld failure, angles, columns, structural steel

18  problems, but I was an understudy then.  I wasn't in

19  the lead.

20      Q      If you could turn to your CV to Page 2

21  under Employment History?

22      A      Yes.

23      Q      Is this a complete statement of your

24  employment history since graduating from Penn State?

25      A      Yes.

1     Q    Okay.  First you were employed by Shockey

2  Brothers?

3     A    Yes.

4     Q    Winchester, Virginia?

5     A    Yes.

6     Q    And you were a product engineer?

7     A    Yes.

8     Q    What was the business of Shockey Brothers?

9     A    I was hired as a structural engineer in

10  designing buildings.  All these -- every one of these

11  were structural engineering.  I was hired as a

12  structural civil engineer, which was primarily with a

13  structural emphasis.

14     Q    So all of the -- all the employment that

15  you had between 1981 and 1996 was structural

16  engineering work?

17     A    Primarily at the one firm, as I got older,

18  I was also doing a lot of marketing of the firms.

19     Q    And that was at Witmer Engineering, Beaver

20  Falls?

21     A    Yes.

22     Q    And were your responsibilities other than

23  the addition of marketing --

24     A    Yes.

25     Q    -- later on, were your job responsibilities

1   essentially the same at each of these employers?

2       A    Yes, structural, yes.

3       Q    Mostly related to the design and

4   construction of buildings?

5       A    Yes.

6       Q    Structures?

7       A    Yes.

8       Q    Okay.  You mentioned several times already

9   this morning that you worked for various insurance

10  carriers.  Which insurance carriers do you do

11  investigations for?

12      A    State Farm, Allstate, Erie, Ohio Casualty,

13  Donegal, Everett Cash, St. Paul, Kemper, Travelers,

14  Penn National, Tuscarora Wayne, to name a few.

15  There's others.

16      Q    And what percentage of your work is devoted

17  to forensic engineering as opposed to the design or

18  whatever other work you do here at Hughes

19  Engineering?

20      A    It varies, you know, from week to week,

21  from year to year.  It varies from year to year and

22  month to month.

23      Q    In the last year?

24      A    The last year, less litigation type of work

25  like this, more forensic type of work as far as going

1    out and looking at problem structures for the year

2    2011.

3         Q    Well, is a hundred percent of your time

4    spent in forensics?

5         A    No.

6         Q    Okay.

7         A    I design -- in the last year -- in the last

8    twelve months, we've -- when I say we, there's a

9    group of us that work on these projects.  We've

10   probably done over a dozen buildings.  We're doing

11   one a month.

12        Q    Okay.  So my question to you was, In the

13   last year, can you estimate what the percentage of

14   the different -- differentiating your time between

15   forensic work and the other work that you do here at

16   Hughes Engineering?

17        A    Thirty percent forensic.

18        Q    And how about the year before that?

19        A    Maybe more forensic, 40 percent.

20        Q    Has it always been in the 30 to 50 percent

21   range?

22        A    It's under half.

23        Q    Under half.  Okay.  Have you ever been

24   retained by a manufacturer of a product?

25        A    Yes.

1      Q    What manufacturers?

2      A    I've been an engineer for 30 years, and

3  I've been contacted to help design dozens of

4  different things.  To sit here and tell you which

5  exactly ones, I don't remember.

6      Q    Have you ever been retained by a

7  manufacturer of a product in a litigated matter?

8      A    I'd have to go look.  I can't say

9  unequivocally yes or no.  I'd have to go look.

10     Q    Where would you look?

11     A    Dig back through 20 years of files.

12     Q    Do you have all of your files -- your

13  forensic files?

14     A    I have all the files of the company, yes.

15     Q    Okay.  But as you sit here today, you can't

16  identify for me a single manufacturer of a product

17  that retained you in a litigated matter?

18     A    I can't answer that.  I can't give you a

19  name, no.

20     Q    Are you a member of any expert witness

21  services?

22     A    Yes.

23     Q    Which ones?

24     A    TASA.

25     Q    Do you or does TASA advertise for you?

1      A    Yes.

2      Q    Do you know where?

3      A    No.

4      Q    How long have you been affiliated with

5   TASA?

6      A    I'm going to have to say 10, 15 years.

7      Q    And do you know what areas of expertise

8   TASA lists for you?

9      A    It would be structural, civil, building

10   codes, safety codes, safety issues, construction

11   accidents.

12      Q    And before they market your services, do

13   you approve the areas of expertise that they're going

14   to market for you?

15      A    Yes.

16      Q    About how many cases a year do you get

17   through TASA?

18      A    Maybe one.

19      Q    Did you get this case through TASA?

20      A    No.

21      Q    Okay.  I'm going to show you, Mr. Hughes,

22   two documents.  In this case, I received 2 logs of

23   testimony, one dated April 14th, 2011, which I have

24   marked Hughes 4, and one I received today that's

25   dated July 11th; and that's marked Hughes 5.  Is that

Page 38

1  correct?

2                              - - -

3              (Whereupon the 5-Page 4-14-11 Confidential

4  Property of Hughes was marked, for identification

5  purposes, as Exhibit Number 4.)

6              (Whereupon the 4-Page 7-11-11 Testimony Log

7  of Hughes, PE was marked, for identification purposes

8  as Exhibit Number 5.)

9                              - - -

10      A    Yes.

11  BY MR. KUNSCH:

12      Q    Okay.  And did you prepare both of those?

13      A    Yes.

14      Q    The list of Hughes 4 I'd like to talk

15  about, first if I can.  That goes from 2006 to 2010?

16      A    Yes.

17      Q    Okay.  And did any of the matters that are

18  listed in Hughes 4 deal with product liability

19  matters involving ladders?

20      A    No, no testimony on ladders.

21      Q    Okay.  The testimony log that I received

22  this morning, Hughes 5, this contains matters from

23  2008 to 2010; is that correct?

24      A    Correct.

25      Q    Have you testified in 2011 other than

Page 39

1   today?

2        A    Yes.

3        Q    Do you know why that's not on this -- why

4   those instances are not on this list?

5        A    I have not testified.  I consider

6   testifying and depositions two different things.

7        Q    Well, under Federal Rules of Civil

8   Procedure 26, if you want to be an expert in federal

9   court, you have to maintain a list of all cases that

10  you testified at trial, deposition, or arbitration.

11  Do you understand that?  Was that explained to you?

12       A    No.  I'm an engineer.  I mean, and I think

13  if I -- I'm an engineer.  I think if I explained that

14  to a judge, he'd understand.  Now, I understand now

15  you're explaining it to me, but I am not aware of

16  that.  So I would like seriously to hear you repeat

17  it just so I --

18       Q    Okay.  You ought to have Mr. Berg send you

19  a copy of Federal Rule 26, and you may be surprised

20  to know what federal judges accept from professional

21  expert witnesses, because they can be pretty

22  demanding.  So --

23       A    I've never had -- sir, I've never had an

24  issue.  I've produced this to attorneys like you in

25  the past and never had anybody that's -- this is the

1  first time I've ever had this issue brought up ever.

2       Q    Okay.  You ought to look at Federal Rule 26

3  and have Mr. Berg talk to you about that.  Okay?  How

4  many times have you testified in 2011 at trial,

5  deposition, or otherwise?

6       A    I can print it out.  Let me go find out.

7  If that's -- this is obviously an issue.  I can go

8  out and get you an exact, if you'd like to take -- I

9  don't remember --

10      Q    Okay.  Well, let me understand -- let me

11 understand something.  The list that you prepared for

12 Hughes 4, this appears to list trial, arbitration,

13 and deposition testimony?

14      A    Yes.

15      Q    The list that's Hughes 5, is this just

16 trial testimony?

17      A    Yeah, that's what I thought you wanted.

18 That's exactly what I thought you wanted.  I was told

19 that you wanted that in the last week or so, two

20 weeks.

21      Q    Well, you've been told wrong because I've

22 been asking for this for months, and Mr. Berg is

23 fully aware of what the federal rules require; and

24 I've been asking for your Rule 26 testimony log.

25 That's all I've ever asked for.  So is there a list

1    that you can give us similar to what you've done here

2    in Hughes 5 that lists for the last four years your

3    trial, deposition, and arbitration testimony?

4         A    This is all I had in my file right here.

5    This is what I --

6         Q    And that's Hughes 4, Hughes 4.  Just so we

7    know, you said this.  I need to make sure the record

8    is clear what we're talking about.

9         A    This is all I have.  I have this back for

10   20 years.

11        Q    And how did you make Hughes 5?

12        A    We actually went in here, looked at an

13   email or something that came from either you or Berg.

14        Q    It wouldn't have been from me because I

15   don't communicate with other parties' experts.

16        A    Well, I mean, through -- it may have been

17   your request that he forwarded to me; and, basically,

18   it asks for more detail on each one of these cases,

19   which was going to take a lot of time.  So I -- I

20   said -- gave him the -- you know, let's go back

21   through the files and pull out the ones that --

22   strictly testimony and try to give him the case

23   captions and whatever.  We thought we did the right

24   thing here.

25        Q    Okay.  But Hughes 5 only contains trial

Page 42

1   testimony?

2        A    Yes.

3        Q    Okay.  But it does not have anything from

4   2011.  Even Hughes 4 had nothing from 2011.

5        A    No.

6        Q    Is there a version of Hughes 4 that has

7   2011?

8        A    That is the latest thing I have.

9        Q    That's the latest thing.  And you can't

10  tell me as you sit here today how many times you

11  testified in 2011?

12       A    No, but I can find out.

13       Q    Okay.

14       A    Yes, that's something I can get very

15  quickly.

16       Q    Well, you're probably going to have to do

17  that at -- we don't have the time right now to do it.

18       A    Well, let me just take a break for a

19  second.  I just want to take a bathroom break.

20       Q    Okay.

21                        - - -

22       (Whereupon there was a recess in

23     the proceedings.)

24                        - - -

25  BY MR. KUNSCH:

1        Q     All right.  I asked you previously about

2    whether there was any testimony on behalf of a

3    manufacturer of a ladder on Hughes 4.  I'm going to

4    broaden that question.  Have you ever testified in a

5    product liability matter that involved a ladder?

6        A     Yes.

7        Q     Where?

8        A     I can only tell you it was out in Ohio.  I

9    don't --

10       Q     Was it state court or federal court?

11       A     I don't recall.

12       Q     Do you know when it was?

13       A     I have testified under six times on ladders

14   and in the Mid-Atlantic states.

15       Q     Well, under six times.  Can you give me a

16   better estimate than that?

17       A     That's why I was --

18       Q     Okay.

19       A     That's why I was -- and I know it was the

20   east coast.

21       Q     Okay.  In any of those cases, were you

22   retained by the manufacturer of the ladder?

23       A     I don't remember.  I do plaintiff and

24   defense work.  I have done both.

25       Q     This case involves a ladder, right?

1    A    Yes.

2    Q    Have you ever been retained by a ladder

3  manufacturer?

4    A    Not that I recall.

5    Q    Okay.  The less than six ladder cases that

6  you've had or testified in, which one is it?

7    A    I'd have to go back and look.

8    Q    Well, that's what -- my question to you is,

9  you said less than six ladder cases.  Have you

10  testified in every ladder case you've ever had?

11    A    No.

12    Q    No.  Has there been approximately less than

13  six cases or less than six times that you've

14  testified in a ladder case?

15    A    I'd have to go look.

16    Q    What was your answer earlier?  You said

17  less than six ladder cases.  Did you mean cases that

18  you've had or cases that you've testified in?

19    A    Cases that I had.

20    Q    Okay.  And did any of them involve

21  Louisville Ladders?

22    A    I don't recall.

23    Q    Do you know, did any of them involve

24  A-frame ladders?

25    A    I haven't -- I don't recall.

1       Q     Did any of them involve extension ladders?

2       A     I don't want to be specific.  I don't --

3       Q     Do you maintain reports that you've

4    authored in past cases?

5       A     They would be buried in files.

6       Q     And do you maintain files here?

7       A     Yes.

8       Q     Do you have a document retention policy for

9    litigated or forensic matters?  Well, companies

10   sometimes have document retention policies that say

11   you hold on to a document for seven years and then

12   it's destroyed in the ordinary course of business.

13   So my question is, Do you have a document retention

14   policy for litigated matters?

15      A     No.

16      Q     In other words, they get filed, closed.

17   They get put in a box and they get stored?

18      A     I have all the files -- I think I do --

19   since I've been in business.

20      Q     Okay.  Have you ever had a case that

21   involved the foot mechanism for a ladder prior to

22   this one?

23      A     Again, I don't --

24      Q     In the six cases involving ladders that

25   you've had before, was the ladder at issue in the

1   case, or was the ladder incidental to the case that

2   you were working on?

3        A    Oh, the ladder was the issue.  The ladder

4   was the issue.  I've had --

5        Q    In each of those cases, did you opine that

6   the ladder was defective?

7        A    One case that I do recall now as I'm

8   sitting here is, a rail failed.  One of the rails on

9   a ladder failed.  That was a Werner ladder.

10       Q    And how did the rail -- was it fiberglass,

11  aluminum, or wood?

12       A    It was an aluminum ladder, and that's all I

13  can -- I just remember that --

14       Q    You don't remember if it was a stepladder,

15  an extension ladder?

16       A    That was an extension ladder, but I have

17  also done cases with stepladders; but the one that I

18  recall sitting here was an extension ladder.  And it

19  was out in Ohio someplace.  But I've done ladder

20  cases in Pennsylvania and Ohio.  But I just don't

21  recall where.

22       Q    Have you ever been qualified as an expert

23  in the design of ladders?

24       A    No.

25       Q    Have you ever been qualified as an expert

Page 47

1    in the manufacture of ladders?

2        A    No.

3        Q    Have you ever failed to qualify as an

4    expert in court?

5        A    Not that I recall.

6        Q    Do you consider yourself an expert in

7    ladder design?

8        A    No, just ladder safety.  I don't design

9    ladders.

10        Q    Have you ever been retained by Mr. Berg

11    before?

12        A    No.

13        Q    Have you ever testified against Louisville

14    Ladder?

15        A    I've been involved in these drop-down

16    ladders, these ceiling ladders, now that I'm sitting

17    here.  I don't know who made them, sitting here.

18        Q    How many -- you're talking about attic

19    ladders?

20        A    Yes.

21        Q    Wood or fiberglass or aluminum?

22        A    More than one and I'd have to go back and

23    look at the file.  I think -- I don't want to say

24    they were Louisville, but they could be.

25        Q    Do you have any active ladder cases other

Page 48

1    than this one?

2         A    I have an attic pull-down ladder device

3    that I'm holding here as evidence.  I don't know who

4    made it.  You know, I have it here.  I don't know --

5    sitting here I can't tell you what it is, but it's

6    been years.  I don't know if it's still active or

7    not.

8         Q    What methodology do you use to reach

9    opinions in a matter such as this?

10        A    First thing I did is -- obviously, my

11   initial contact was with Mr. Berg, and I have in my

12   book, I have what I call a data sheet.

13                        - - -

14             (Discussion held off record.)

15                        - - -

16             THE WITNESS:  Chapter 30 of my book talks

17   about ladders, scaffolding, and platforms.

18   BY MR. KUNSCH:

19        Q    Right.

20        A    Those type of accidents.  In the back of

21   the chapter on Page 43, there is a data sheet that I

22   -- do you want me to get a copy of this for you?

23        Q    Perfect.

24                        - - -

25             (Discussion held off record.)

1  BY MR. KUNSCH:

2      Q    So you were talking to me about your

3  methodology and that you looked at this data sheet?

4      A    When Mr. Berg would have first called me, I

5  would have pulled this out, and if you notice the

6  scribbling on --

7      Q    Yeah, let's go this way.  I'm going to mark

8  the data sheet as Hughes 6, and this is Page 483 of

9  your book "Building Design and Construction Hazards";

10  is that correct?

11                      - - -

12          (Whereupon the Pages 482 and 483/Chapter 30

13  of "Ladders, Scaffolding and Platforms" was marked,

14  for identification purposes, as Exhibit Number 6.)

15                      - - -

16      A    Correct.

17  BY MR. KUNSCH:

18      Q    And then I'm going to mark a package of

19  documents which includes your notes which we obtained

20  from your file; is that correct?

21      A    Yes.

22      Q    For the record, I made copies.  Mr. Hughes'

23  office actually made copies of various documents from

24  his file.  We did not copy the color photographs, a

25  big stack of those from my expert which are in his

Page 50

1    file, nor the Louisville Ladder documents or the

2    report which we already had, but we made copies of

3    everything else from your file; is that correct,

4    Mr. Hughes?

5        A    Yes.

6        Q    And I'm going to put the binder clip on

7    those.  And we are going to mark the collection of

8    those documents as Hughes 7.  And so I believe you

9    were about to tell me, and I'm going to let you

10   continue now, is that you would have taken the data

11   sheet which we have marked as Hughes 6.  And in your

12   initial conversation with Mr. Berg, you would have

13   gone through that sheet taking the notes that are on

14   Hughes 7; is that correct?

15                   - - -

16            (Whereupon the 30 Pages of Notes and

17   Information was marked, for identification purposes,

18   as Exhibit Number 7.)

19                   - - -

20       A    Correct.

21   BY MR. KUNSCH:

22       Q    And the date of that communication was

23   what?

24       A    March 4th.

25       Q    Now, go ahead.  Continue, please.  You were

1    about to tell me what you did.

2         A    I would have -- I went down, first of all,

3    to see if the case was legitimate.  I asked him these

4    questions that basically come right out of my book,

5    and they're, like, time, date, place, people present,

6    business still exist, his height, his weight, you

7    know, the scaffold/ladder manufacturer, who erected

8    it, you know, the distributor, whether rented or

9    owned and by whom.  Was it a commercial, industrial,

10   or household ladder, you know, stepped, fixed,

11   extension, portable, wood, aluminum, these would have

12   been basic questions I would have asked him, you

13   know.

14        Q    And these are your notes, correct?

15        A    Correct.

16        Q    And there's a page -- there's page notes on

17   the other side of that.  You don't believe those --

18   they're actually written on a picture; is that

19   correct?

20        A    Yeah, it was scrap.

21        Q    Scrap paper?

22        A    Scrap paper.

23        Q    And you don't believe those have anything

24   to do with this case; is that correct?

25        A    I'm not sure.  So --

1      Q    Okay.  We've made a copy of that, and then
2    there's a second page of notes or another page of
3    notes, rather.  And what's that dated?
4      A    3-2-11.
5      Q    So was 3-2-11 the first conversation you
6    had with Mr. Berg?
7      A    I'd -- I don't -- I have to take it for
8    what it is.  It's dated that.  So I'm going to say
9    yes.
10     Q    Do you have anything else dated earlier
11   than that, to your knowledge?
12     A    No.
13     Q    Okay.  Did you ever speak to Andy Shecktor?
14     A    Yes.
15     Q    How many times?
16     A    Once.
17     Q    When was that?
18     A    Sometime prior to developing the report, so
19   within -- before March 8th.
20     Q    Where are the notes from that conversation?
21     A    That would have been -- the first contact,
22   Mr. Berg called, and then this is the fourth.  So
23   this is the introductory call here, and then this
24   gentleman would have been a part of that.
25     Q    Okay.  So you believe you spoke to Mr. Berg

1   alone March 2nd, 2011, which is this page of notes

2   which is part of Hughes 7, correct?

3       A    Correct.

4       Q    And then the second date, which was

5   March 4th, you believe you spoke to Mr. Shecktor and

6   Mr. Berg?

7       A    Yeah, it was a conference call.

8       Q    Okay.  And that was the only time you spoke

9   to Andy Shecktor?

10      A    Yes.

11      Q    And to reiterate, you never went to the

12  scene, correct?

13      A    Correct.

14      Q    And you never looked at the ladder,

15  correct?

16      A    Correct.

17      Q    And did you ever receive Mr. Shecktor's

18  deposition?

19      A    No.

20      Q    Enclosed within Hughes 7 are some copies of

21  pictures and some of those -- and some exhibits from

22  Mr. Shecktor's deposition.  Do you know when you

23  received those?

24      A    No.

25      Q    Was it before you wrote your report?

1      A    No.  I would have had it -- if I would have

2   had the deposition, I would have had it right here.

3      Q    Under background?

4      A    Yes.

5      Q    You agree with me your report doesn't

6   identify any materials that you reviewed, is that

7   correct -- or he supplied Mr. Hughes photos of the

8   area taken the day after the incident, photos of the

9   ladder and photos of the revised shoe.  So are these

10  -- are we talking about the photographs that are

11  enclosed with Hughes 7?  These are the photographs

12  that you referred to in 1.0 background of your

13  report?

14     A    Yes.

15     Q    And all those photographs were provided to

16  you by Mr. Berg?

17     A    Yes.

18     Q    The documents that you received after you

19  wrote your report, the Louisville Ladder documents

20  and these photographs, how did they arrive in your

21  office?

22     A    I don't -- you know, this gentleman sent

23  stuff a couple times.  I don't -- I didn't keep the

24  envelopes or anything.  I don't know.

25     Q    And there's no cover letter, you would

Page 55

1   agree with me?

2       A    No, there's no cover letters here, no.

3       Q    When you were initially retained, did you

4   ask for all the relevant information?

5       A    Well, I would have asked these questions.

6   These are the questions that I asked, you know, the

7   name of the person, the age of the person, the time,

8   the date, the place.

9       Q    Again, you can answer whatever questions

10  you want, but we're going to be here all day if you

11  don't answer my question.  My question was very

12  simple.  Did you ask for all available information to

13  be sent to you?

14      A    Yeah, yes.

15      Q    And you've been involved in a number of

16  litigated matters in your career; is that correct?

17      A    Yes.

18      Q    And you're aware that depositions get taken

19  much like your deposition is being taken today?

20      A    Yes.

21      Q    Were you told that Mr. Shecktor gave a

22  deposition in this case?

23      A    I don't recall.  I would have -- if I would

24  have asked for it, I'm sure it would have been

25  supplied.

1     Q     You typically would ask for transcripts of

2     depositions, wouldn't you?

3     A     Yeah.   It's typically forthcoming.

4     Q     Have you ever spoken to anyone who works

5     for Louisville Ladder about their products?

6     A     No.

7     Q     Have you ever performed any tests on a

8     Louisville Ladder product?

9     A     Because I've worked with other ladder

10    cases, I'd have -- I can't say yes or no to that

11    answer.   I'm not sure.

12    Q     Did you do any tests with respect to the

13    model ladder involved in this incident?

14    A     No.

15    Q     Do you agree that for a product or

16    component to be the cause of an accident, you need to

17    identify the malfunction of that product or

18    component?

19    A     Yes.

20    Q     Do you agree that the fact that a product

21    is involved in an accident does not necessarily make

22    it defective?

23    A     Yes.

24    Q     Have you ever determined that the misuse of

25    a product was the cause of an accident?

1     A    Yes.

2     Q    Did you know Mr. Shecktor before this

3  lawsuit?

4     A    No.

5     Q    Did you know Mr. Berg before this lawsuit?

6     A    No.

7     Q    Do you know Mike Van Bree?

8     A    No.

9     Q    We went off the record earlier, and your

10  assistant brought us in a list of -- an updated

11  testimony log to include things since that were not

12  included on Hughes 5, correct?

13     A    Correct.

14     Q    We're going to mark that as Hughes 8.

15                   - - -

16         (Whereupon the2 Pages 7-12-11 Confidential

17  Property of Hughes, PC was marked, for identification

18  purposes, as Exhibit Number 8.)

19                   - - -

20  BY MR. KUNSCH:

21     Q    If you could, sir, go back to Hughes 5 for

22  a minute, starting at the first page, Yarbough v.

23  Baldwin School --

24     A    Yes.

25     Q    -- what did that matter involve?

1        A     A construction dispute.

2        Q     The next matter Brittain v. Brittain, what

3   did that involve?

4        A     Construction dispute.

5        Q     Cribbs v. Jacques, J-A-C-Q-U-E-S, what did

6   that involve?

7        A     That was a building code dispute.

8        Q     Okay.  The next with one is Aloi, A-L-O-I,

9   v. Elk Custom Homes.  What did that involve?

10       A     Construction dispute.

11       Q     Glasso v. Roberts?

12       A     That involved a personal injury.

13       Q     Involving what?

14       A     A pool.

15       Q     A pool?  Martin v. Crossroads Mall?

16       A     I don't recall.

17       Q     Was it a slip and fall?

18       A     I don't know.

19       Q     You don't know.  The Losco matter, what did

20   that involve?

21       A     I don't recall.

22       Q     Did you actually testify in Philadelphia?

23       A     I have in the past.  I don't know if I did

24   on that case or not.

25       Q     The Cisney, C-I-S-N-E-Y, and O'Donnell v.

Page 59

1    Cernics?

2         A    Construction.

3         Q    Strobel, S-T-R-O-B-E-L, what did that

4    involve?

5         A    That was a personal injury accident in a

6    threshold of a doorway.

7         Q    Construction case?

8         A    No.  It was a building code issue.

9         Q    Clemente, C-L-E-M-E-N-T-E, what did that

10   involve?

11        A    Construction.

12        Q    Frawley, F-R-A-W-L-E-Y?

13        A    Don't recall.

14        Q    Kukurin, K-U-K-U-R-I-N, what did that

15   involve?

16        A    It was a defense case involved in

17   construction.

18        Q    Ford v. Vititoe?

19        A    This was a person that was hit with an

20   automobile.

21        Q    What was the nature of your testimony in

22   that case?

23        A    They were interested in determining the

24   speed of the person based on the impact.

25        Q    The Dessove, D-E-S-S-O-V-E, matter?

Page 60

1      A    I remember testifying.  I'm just trying to

2  think what it was on.  That was an injury.  It was a

3  trip injury in a building in a Holiday Inn.

4      Q    Building design case?

5      A    Yes.

6      Q    Anstasi, A-N-S-T-A-S-I, what did that

7  involve?

8      A    That was a defense case where somebody was

9  injured, trip and fall.

10      Q    So I think the first page of that says that

11  you underlined to the parties that you were retained

12  by, and it actually says it on that same page and

13  underlines, Anstasi?

14      A    That was -- that's an error.  That was

15  defense.

16      Q    You worked for Old Forge?

17      A    Yes.

18          MR. KUNSCH:  Off the record.

19                      - - -

20          (Discussion held off record.)

21                      - - -

22  BY MR. KUNSCH:

23      Q    I'm going to continue, sir.  We only have

24  one copy of what we've marked as Hughes 8.  This is

25  testimony since 2010.  We don't have case names.  We

 1   just have attorney names now.

 2        A    That's an overlap.

 3        Q    Oh, I see here.  That was the Kukurin case?

 4        A    Yes.

 5        Q    Okay.  And let's just make sure.  So the

 6   second matter on there, you were retained by

 7   Colin Cline?

 8        A    Yeah.

 9        Q    Do you know what that involved?

10        A    I don't remember.

11        Q    Okay.  How about the next one, Norfolk

12   Southern?

13        A    Norfolk Southern is -- I do a lot of work

14   with.  I don't testify per se.  They ask me to come

15   in and investigate accidents that they have.  I guess

16   they have over 9,000 employees, and they try to do

17   some preventative -- you know, try to get ahead of

18   the ball.  And any -- when anyone gets injured or

19   hurt, a lot of times, they'll bring me in say, hey,

20   could we have prevented this.  So it's not a

21   litigation thing.  It's more of a -- they're trying

22   -- they're trying to be a little proactive, trying to

23   find out what happened.

24        Q    And that's when you testified for a

25   David Ray in West Virginia?

1      A     Yeah, these two -- we've already talked

2  about these two, these --

3      Q     Please don't write on this one.  Oh, I see

4  Eric Wilson.  I don't believe we talked about the

5  David Ray one, though, to be honest with you.  It's

6  not on the other list?

7      A     I don't recall.

8      Q     Okay.  I think we have that one.  We have

9  that one.  Again, Norfolk Southern, is that another

10  one of those similar?

11      A     Yes, yes.

12      Q     You were retained by Huddleston Bolen?

13      A     Obviously, I have, but I don't recall what

14  over.

15      Q     Okay.  How about the last one?

16      A     That is an injury.  That's recent.  That

17  was within the last month.  And that was an injury on

18  a staircase, an exterior staircase, that was building

19  code issues.  There was no handrails.

20      Q     Okay.  When you were initially contacted in

21  this matter, did you understand that the likely

22  outcome of your investigation would be to write a

23  report and testify?

24      A     Yes.

25      Q     When you were initially contacted, were you

1  told that the product was the cause of the accident

2  or a potential cause of the accident?

3       A    I don't know if that was the wording, but

4  they just -- Mr. Berg over the phone briefly

5  described a gentleman who was up on a ladder pruning

6  limbs on a tree, and the bottom of the ladder kicked

7  out.  And he fell and injured himself.  That was --

8  then I started asking questions.

9       Q    Okay.  And we've talked about the notes

10  that you have based upon two contacts, one with

11  Mr. Berg and one on a conference call with Mr. Berg

12  and Mr. Shecktor?

13      A    Yes.

14      Q    Did you have any other communications, oral

15  communications before you wrote your report?

16      A    Not that I recall.

17      Q    Did you request any documents or

18  information that you didn't receive before you wrote

19  your report?

20      A    Not that I recall.

21      Q    Do you agree that a thorough investigation

22  is essential to a reliable opinion of causation?

23      A    Yes.

24      Q    What's the meaning of a possible cause?

25      A    It means it could be one of many root

Page 64

1   causes to the problem.

2       Q    What's the meaning of a probable cause?

3       A    Most likely it narrows it down.

4       Q    Are you satisfied in your mind that your

5   investigation and analysis were sufficiently thorough

6   to permit you to testify under oath in court

7   concerning your findings and opinions?

8       A    Yes.

9       Q    Why didn't you go to the accident scene?

10      A    Because it wouldn't have changed the -- the

11  -- what I was focusing on was the gentleman.  I

12  asked, you know, Did the ladder go to the left or to

13  the right?  Did something fail?  Did something fail

14  on the ladder?  Came back no.  The ladder's not

15  damaged?  No.  Were you jumping on the ladder?  You

16  know, how much do you weigh?  What were you carrying?

17  Were you leaning?  You know, I have to rule these

18  things out.

19          I mean, he says the ladder -- the bottom of

20  the ladder kicked out.  And I said, When you say

21  kicked out, what was it resting on?  You know, was it

22  on asphalt?  Was it on concrete?  Was it on grass?

23  Was it on mud?  These questions would've come out in

24  detail here.  Those were all the questions that I

25  asked; and after going through all these questions, I

1  didn't think it was necessary; and they -- they said

2  they have photographs, which I was interested in the

3  cleats.

4      Q    Did you rule out that he was leaning?

5      A    I asked him -- I mean, the information --

6  the information that I asked was, were you leaning.

7  I mean, if he was doing something abnormal on the

8  ladder that they weren't truthful with, then that was

9  my --

10     Q    Did you rule out --

11     A    Yes.

12     Q    -- that he was leaning?

13     A    Yes, I asked him that.

14     Q    And he said he wasn't?

15     A    Yeah.

16     Q    Is it fair to say since you didn't go to

17  the scene, you didn't take any measurements?

18     A    Correct.

19     Q    Other than speaking to Mr. Shecktor and

20  your conversations with Mr. Berg, you didn't conduct

21  any interviews?

22     A    The only interview I conducted was with

23  Mr. -- you know, a phone interview with Mr. Shecktor.

24     Q    Other than the two communications that

25  we've talked about, the fact that you went to the

1    Lowe's and you took the pictures that we marked

2    earlier, did you talk to anyone else prior to writing

3    your report?

4         A    No.

5         Q    Did you contact ANSI about the ladder or

6    the relevant standard?

7         A    No.

8         Q    Did you contact OSHA?

9         A    I looked at their -- I looked at both.  I

10   didn't contact them.  I just looked at their

11   regulations.  I didn't contact them.

12        Q    What was the reason for going to the

13   Lowe's?

14        A    In our initial conversations with Mr. Berg

15   and Mr. Shecktor, Mr. Shecktor indicated that he

16   thought that the cleats kicked up in the bottom.  The

17   bottom of the ladder kicked out.  It didn't go

18   sideways.  It went out.  For that to happen, there

19   was a bearing failure.  That meant that there was a

20   failure between the contact surface and the bottom of

21   the ladder.  So I asked him, you know, well, what is

22   -- did the ladder have cleats or legs -- did the legs

23   have cleats on them.  He said yes.  He also said they

24   have vertical slots in them, and he -- they thought

25   initially that might -- could that have caused the

1  problem.  And that was asked.  They -- they asked

2  that question right up front.  Could that have caused

3  the problem.

4      Q    Is Mr. Shecktor a ladder expert?

5      A    No.

6      Q    Sitting here today, do you confirm the

7  accuracy of the report you marked as Hughes 2?

8      A    I think I mentioned that the ladder was 18

9  feet, and it's actually 16 feet.  That's it.

10      Q    Are you satisfied that when you made your

11  report, you had all the information necessary to draw

12  the conclusions you made?

13      A    Yes.

14      Q    Is your review of this matter complete?

15      A    Unless somebody asks me something today

16  that you want or Mr. Berg wants.

17      Q    Is there anything you have asked to do that

18  you have not been permitted to do?

19      A    No.

20      Q    Was there anything that anyone else has

21  asked you to do that you have not done?

22      A    No.

23      Q    Did you determine whether the product had

24  been damaged at all prior to the date of the

25  incident?

1      A     I asked them.  They said no.

2      Q     What did you do other than ask them?

3      A     Nothing.

4      Q     Did you do any testing on the ladder or its

5   components?

6      A     No.

7      Q     How many times did Mr. Shecktor use this

8   ladder?  How many days did he use it prior to the

9   date of this incident?

10      A     I don't recall, but I -- the only thing I

11   do recall was that this wasn't the first time.  It

12   wasn't the first time he was up the ladder.

13      Q     Do you know what purpose he used the ladder

14   for before the date of the incident?

15      A     I'd have to refer to my notes.

16      Q     You may refer to whatever you need to, sir.

17      A     Okay.  My notes say that the ladder was

18   brand new, third time, less than a year old.

19      Q     Third time he had used it?

20      A     Correct.

21      Q     Did he tell you whether he had any prior

22   problems or concerns with the ladder?

23      A     No.

24      Q     Did he read the warning labels on the

25   ladder prior to using it?

1        A     No mention.

2        Q     I'm going to show you a picture which was

3    marked as Shecktor 4.  That's the identification

4    label on the ladder.  Would you agree with me about

5    that?

6        A     Yes.

7        Q     And it says it meets in conformance with

8    ANSI A 14.2; is that right?

9        A     Correct.

10       Q     Do you agree with that, the ladder meets

11   and conforms with ANSI A 14.2?

12       A     I have to read ANSI the whole way through.

13   I don't have it in front of me here.

14       Q     As part of your investigation of this case,

15   did you read ANSI A 14.2?

16       A     Yes.

17       Q     You did?  And is there anything in your

18   report which indicates that this ladder did not meet

19   ANSI A 14.2?

20       A     I think there's an issue with the shoes,

21   the cleats.  I mentioned that in my report.  I can't

22   sit here and tell you that that -- that the ANSI A

23   14.2 goes into specifics about complete design.  I

24   don't have that in front of me, but I know ANSI A

25   14.2 talks about some of the issues that are on this

Page 70

1    label.

2        Q    Do you have an opinion today, sir, as you

3    sit here that the ladder in any way violates ANSI A

4    14.2?

5        A    Yes.

6        Q    In what way?

7        A    It's not safe.

8        Q    It's not safe?

9        A    Yes.

10        Q    In what way?

11        A    The bearings.

12        Q    What do you mean by bearings?

13        A    The cleats have a problem with the design

14    in the -- the slot in the -- the swivel.

15        Q    What's the purpose of the swivel design?

16        A    The purpose of the swivel design is to get

17    the -- actually get the swivel out of -- out of there

18    if you want to put that right into the -- if you want

19    to elect to put the end of the ladder into a soft

20    surface like soils.  It will also provide uniform

21    contact surface on surfaces that may not be level;

22    and if you're going to put the cleat on surfaces such

23    as flooring or interior surfaces, it provides uniform

24    contact.

25        Q    Was the ground surface where this ladder

Page 71

1   was installed on the day of the accident flat?

2        A    No.

3        Q    Why not?

4        A    The ground surface -- no ground surface is

5   perfectly flat.

6        Q    Were there any other impediments on the

7   ground surface?

8        A    When you say impediments, could you

9   explain?

10        Q    Tell me all the ways in which this ladder

11   was not on a flat surface on the date of the

12   accident.

13        A    It was on a ground surface.  It was on

14   soils.

15        Q    Anything else?

16        A    No.

17        Q    Besides soil?

18        A    No.

19        Q    And --

20        A    Excuse me.  Grass, it could be grass, a

21   little bit of grass there, but --

22        Q    Does your opinion rely upon the fact that

23   this ladder was only placed upon soils or grasses at

24   the time of the incident?

25        A    No.

1      Q    So if there were other things on the ground

2  that made the surface not be level, that doesn't

3  matter to you?

4      A    I would have asked the gentleman when he

5  set the ladder up, did he have -- did both legs have

6  contact with the ground, you know, and what were you

7  leaning against.  I mean, that's very key.  All four

8  points of contact, what were they, what condition

9  they were in.  He indicated to me that the top of the

10  ladder was bearing against this pine tree and that

11  the bottom was soil that was relatively flat; but,

12  you know, obviously, a yard is never perfectly flat.

13  So I understood that.

14      Q    Were there any roots above the ground

15  level?

16      A    Never mentioned that.

17      Q    Never mentioned it?  Would that be germane

18  to your opinions?

19      A    Well, if one of the cleats was sitting on a

20  root, it was unstable, he never made mention of that.

21      Q    Okay.  And you understand it's important

22  for the feet of the ladder to be in contact with the

23  ground surface as part of setting up the ladder?

24      A    Yes.

25      Q    You have no criticisms of the warnings and

1    instructions on the ladder; is that correct?

2         A    Correct.

3         Q    Did Mr. Shecktor set the ladder up one time

4    or more than one time on the date of this accident?

5         A    It's my understanding that -- I don't have

6    that listed in my questions here.

7         Q    You don't.  So is it fair to say you don't

8    know?

9         A    I don't know.

10        Q    How many times did he climb up and down the

11   ladder prior to the incident occurring?

12        A    I don't know.

13        Q    How tall is Mr. Shecktor?

14        A    I don't know.

15        Q    How much did he weigh at the time of the

16   incident?

17        A    He was 54, and he weighed 154 pounds.

18        Q    What types of shoes was he wearing on the

19   day of the accident.

20        A    I don't know.

21        Q    We've discussed the condition of the

22   surface where the ladder was positioned.  Was there

23   any slope to the ground?

24        A    I'm relying on the photographs.  The

25   photographs that were supplied to me, I didn't have

Page 74

1    an issue with that.

2         Q    Do you know what the grade was?

3         A    No.

4         Q    Who set up the ladder?

5         A    It's my understanding he did.

6         Q    Do you know how he verified that the ladder

7    was set up correctly?

8         A    That's a question that I had asked.  I said

9    to him -- you know, ladders to be in compliance with

10   ANSI and OSHA have to be at a 75-degree angle.  Of

11   course, you know, nobody knows what a 75-degree angle

12   is.  He implied that he was a fireman or had

13   experience with ladders and had set them up and had

14   taken some sort of training in that.  Okay.  That

15   was --

16        Q    Do you know how it was that he determined

17   that the angle was correct?

18        A    No.

19        Q    There are two sections of the ladder; is

20   that correct?

21        A    Yes.

22        Q    There's a base section and a fly section;

23   is that correct?

24        A    Yes.

25        Q    How was the fly section extended?

Page 75

1      A    Don't know.

2      Q    Did he extend it on the ground and then put

3   the ladder up, or did he put the ladder against the

4   tree and then extend the fly section?

5      A    I don't know.

6      Q    What was the ladder resting against?

7      A    The tree.

8      Q    Which part of the ladder was contacting the

9   tree?

10     A    The two rungs.

11     Q    Which two rungs?

12     A    The side -- the side rails of the ladder

13   were in contact with the tree.

14     Q    There's two sections to the ladder; is that

15   right?

16     A    Yes.

17     Q    And there's a rail on each side?

18     A    Yes.

19     Q    And there are rungs that connect the two

20   rails?

21     A    Yes, yes.

22     Q    Your testimony is that the rails were in

23   contact with the tree?

24     A    Yes.

25     Q    Were any of the rungs in contact with the

1   tree?

2        A     I asked him that.  No, not from the --

3        Q     Did he tie the ladder to the tree either at

4   the top or the bottom?

5        A     I asked that.  Obviously not, no.

6        Q     Was the fly section tied to the base?

7        A     I don't know.

8        Q     Were any provisions made to stop, arrest, or

9   prevent a sideways slide of the ladder top?

10       A     He didn't tie it up, no.

11       Q     Was the rung locks secured or locked?

12       A     Don't know.

13       Q     How were the rung locks checked?

14       A     Didn't ask.  Don't know.

15       Q     How were the feet placed?

16       A     Can you be more specific?

17       Q     There's feet on the bottom of the ladder.

18   What's the surface on the bottom of the feet of the

19   ladder?

20       A     Each rung of the ladder, each rail of the

21   ladder has what I call a cleat, a shoe on the bottom

22   of the ladders.  At the bottom of that is neoprene,

23   and that was in contact with the soils.

24       Q     So when I asked you, where were the feet

25   placed, they were placed, you believe, on the ground?

1        A    Correct.

2        Q    And you believe that they were placed flat

3   on the ground?

4        A    Correct.

5        Q    With the neoprene in contact with the

6   ground surface?

7        A    Yes.

8        Q    And the feet were not spiked into the

9   ground?

10        A    Correct.

11        Q    Were the rubber pads in good condition?

12        A    Yes.

13        Q    The photographs that are attached to

14   Hughes 7 are in the pictures that I have and also in

15   the pictures that you have.  They're all black and

16   white; is that correct?

17        A    Yes.

18        Q    Did you ever ask if there were color

19   pictures?

20        A    No.

21        Q    Did Mr. Shecktor know to keep his body

22   between the side rails?

23        A    I asked him if he was leaning.  He said no.

24   You asked that question earlier.

25        Q    No, I asked you whether he knew to keep his

1    body between the side rails.  I asked you before if

2    he was leaning.  Now I'm asking you if you asked him

3    whether he knew that he was supposed to keep his body

4    between the side rails.

5        A    Oh.  No.  No, I didn't ask that.

6        Q    How did he climb the ladder immediately

7    prior to the incident occurring?

8        A    Can you get more specific?

9        Q    How did he climb the ladder?

10       A    Using his two legs and his two arms.

11       Q    Okay.  Was he holding anything in his

12   hands?

13       A    My understanding, he had a pruning saw.

14       Q    Did you see the pruning saw at any time?

15       A    It's in this -- after the -- it's in these

16   pictures here that they produced.

17       Q    Mr. Van Bree's pictures which you received

18   approximately two months or three months after you

19   wrote your report, is that correct?

20       A    Yeah, these were -- these were produced

21   after.

22       Q    How did he -- how did Mr. -- when you spoke

23   with Mr. Shecktor, did you ask him about pruning

24   shears?

25       A    I said, Were you carrying anything?  Were

1  you drunk?  You know, were you carrying anything,

2  drunk, afraid of heights?  He said he was -- a

3  clipper for the tree.

4       Q    And -- and did you have any other

5  description of the clipper for the tree cited in your

6  report?

7       A    He just -- he just -- he described to me

8  verbally what he was using.

9       Q    Was he holding that as he -- as he climbed

10 up the ladder?

11      A    Yes.

12      Q    So a second ago, you kind of said he used

13 his two arms and two hands to climb the ladder.  He

14 actually used one hand to climb the ladder, didn't

15 he?

16      A    Correct.

17      Q    Was there movement of the ladder while he

18 was climbing it immediately prior to the incident?

19      A    I don't know.

20      Q    Movement of a ladder would indicate

21 instability in the setup, would it not?

22      A    Yes.

23      Q    And you didn't ask the question of whether

24 there was any movement of the ladder as he climbed

25 it?

1      A    I asked him if he had any problems.  He
2  said no.  I mean, when he got up, he said he didn't
3  -- there was -- he was there for a few moments.  He
4  wasn't -- he didn't -- it's my understanding he
5  didn't just go up and this had happened.  He had been
6  up there for a while.
7      Q    Did the ladder move at all in the time that
8  he was on it before the accident happened?
9      A    Never mentioned that.
10     Q    Would that be important to you?
11     A    Yeah.  I would have asked that question,
12  but my response -- his response to that would have
13  been no.
14     Q    Okay.  I'm not asking you about this, what
15  he told you now.  Is it important to you whether the
16  ladder moved at all while he was on it?
17     A    Yes.
18     Q    It might indicate that he was leaning?
19     A    It's an indication that it's unstable.
20     Q    It's unstable, and there may have been a
21  problem with the setup?
22     A    Yes.
23     Q    And you had no information when you wrote
24  your report that there had been any instability in
25  the ladder while he was on it?

Page 81

1      A      Correct.

2      Q      What was Mr. Shecktor intending to do when

3   he climbed the ladder immediately prior to the

4   incident?

5      A      Pruning limbs.

6      Q      How many limbs was he pruning that day?

7      A      I don't have that unless I -- I don't --

8      Q      Had he pruned any limbs prior to this

9   incident?

10     A      I don't know.

11     Q      Do you know what the procedure was that he

12  followed for pruning the limbs?

13     A      No.

14     Q      What was Mr. Shecktor's body position

15  immediately before the incident?

16     A      I'd have to refer to my notes.  I said,

17  Were you leaning, standing or -- he said he was

18  standing and lowering clipper on ladder.  That's the

19  response.

20     Q      So he told you that at the time of the

21  incident, he was standing on the ladder and he was

22  lowering the clipper?  Is that what you just said?

23     A      Were you leaning?  No.  He said he was

24  standing and lowering the clipper on the ladder.

25     Q      Had he cut the limb?

Page 82

1      A     I don't know.

2      Q     What step was he on?  What rung was he on

3   immediately prior to the incident?

4      A     He said he was up 12 feet.

5      Q     Okay.  Do you know when he set up the

6   ladder how many rungs overlapped?

7      A     Well, it's a 16-foot extension ladder.  If

8   he was up 12 feet, he was up towards the top.

9      Q     While Mr. Shecktor was on the ladder prior

10  -- when he climbed the ladder, did he note whether it

11  was stiff or wobbly as he climbed it?

12     A     No mention.

13     Q     Again, those are the indications of

14  stability?

15     A     Yes.

16     Q     In your book there, you talk about -- when

17  you talk about ladders, you talk about most accidents

18  are caused by operators; is that correct?

19     A     Yes.

20     Q     And operators can cause themselves to be

21  injured by making the ladder unstable in what they

22  are doing while they're on the ladder; is that

23  correct?

24     A     Yes.

25     Q     And also not properly setting it up?

1      A      Yes.

2      Q      And also in not choosing the correct ladder

3   for the use that they intend?

4      A      Yes.

5      Q      You have no information about what

6   Mr. Shecktor did while he was on the ladder before

7   the accident happened; am I correct in that?

8      A      What were you doing on the ladder?  Were

9   you cleaning windows, a gutter, or painting?  And he

10  said he was cutting limbs.

11     Q      How big was the limb he was cutting prior

12  to the incident?

13     A      I have no idea.

14     Q      Did he finish the cutting exercise before

15  the incident happened?

16     A      I don't know.

17     Q      How much did the tree pruner weigh?

18     A      I don't have the exact weight.

19     Q      What hand was he holding it in?

20     A      I don't know.

21     Q      Was he moving or standing still when the

22  incident occurred?

23     A      He said he was standing and lowering

24  clipper.

25     Q      So he said his feet were static on a rung?

Page 84

1        A     That's all I have, yes.

2        Q     Is that the information that you relied

3   upon in rendering your opinions in this case?

4        A     Yes.

5        Q     Do you know how high off the ground the

6   limb was that he was intending to cut when he climbed

7   the ladder prior to the incident?

8        A     No.

9        Q     Was Mr. Shecktor wearing gloves at the time

10   of the incident?

11        A     I don't know.

12        Q     Was he wearing goggles?

13        A     I don't know.

14        Q     Have you ever read the warning manual for

15   the tree pruner?

16        A     I wasn't -- I'm not an expert -- I'm not an

17   expert in tree pruning.

18        Q     Did you ever look at the warning label

19   that's on the tree pruner?

20        A     No.

21        Q     Did he exert any -- while Mr. Shecktor was

22   on the ladder prior to the incident, did he exert any

23   side-to-side force on the ladder?

24        A     I asked him, Were you leaning?  And he

25   said, No.  I was standing and lowering clipper.

1    Q    Okay.  Did you ask -- did you have any

2    information about whether the operation that

3    Mr. Shecktor was performing prior to this incident,

4    whether that caused him to impart any force on the

5    ladder?

6    A    No.

7    Q    Would that be important to your opinions to

8    know that?

9    A    No.  I was interested in the moment before

10   it occurred.

11   Q    You were?

12   A    Yes.

13   Q    That's the important moment, isn't it?

14   A    Yes.

15   Q    And do you think you know what happened in

16   the moment before the incident happened?

17   A    Yes.

18   Q    Did anything strike the ladder while

19   Mr. Shecktor was standing on it prior to his

20   accident?

21   A    Not that I was told.

22   Q    Would that be important for you to know?

23   A    It would have been forthcoming because I

24   asked in the one, Were you carrying anything?  Were

25   you drunk, afraid of heights?  I asked, Were you

Page 86

1  leaning on the ladder?  Was there any eyewitnesses?

2  Those are the questions that I would have asked, I

3  did ask, yes.

4       Q    Would it have been important for you to

5  know whether anything struck the ladder prior to the

6  incident?

7       A    If something struck the ladder, that --

8  could that alter my opinions?  Yes.

9       Q    If something struck the ladder enough to

10 cause the ladder to move back and forth from one leg

11 to another, would that be important to your opinions?

12      A    Possibly.

13      Q    If one of the feet came off the ground as a

14 result of something hitting the ladder immediately

15 prior to the incident, would that be important to

16 your opinions?

17      A    Possibly.

18      Q    It would be an indication that something

19 had been done while Mr. Shecktor was on the ladder,

20 had caused it to become unstable?

21      A    Possibly.

22      Q    Shecktor 6 is a picture of one of the

23 labels on the ladder that indicates that failure to

24 read and follow the instructions on the ladder can

25 result in injury or death; is that true?

1      A    Yes.

2      Q    And that actually is true, isn't it?

3      A    Yes.

4      Q    I'm going to show you a picture which is

5  marked Shecktor 7.  That's one of the other

6  instruction labels on the ladder, sir.  It says:  Do

7  not overreach.  Keep body centered between side

8  rails.  Does it not?

9      A    Yes.

10     Q    Okay.  And that's on a caution label?

11     A    Yes.

12     Q    Which advises the user to do certain things

13 with the risk of being injured?

14     A    Yes.

15     Q    Self-explanatory?

16     A    Yes.

17     Q    I'm going to show you a picture which was

18 marked at the deposition of Mr. Shecktor marked

19 Shecktor 10.  Have you seen this picture before?

20     A    I've seen pictures of the tree.  I don't

21 know if I've seen that exact picture.

22     Q    Okay.  Do you know if that shows the tree

23 that Mr. Shecktor was working on at the time of the

24 incident?

25     A    I've always assumed that was the tree.

1     Q    Do you know there's a line that was drawn

2  on that, a black line?

3     A    Okay.  Yes.

4     Q    Do you know what that represents?

5     A    No.

6     Q    I'm going to show you a picture marked

7  Shecktor 11.  There is a circle with an X on it.  Do

8  you know what that represents?

9     A    No.  I've never seen these photographs.

10     Q    There's a circle with a 1 in it.  Do you

11  know what that represents?

12     A    No.

13     Q    There is a 2 with an arrow pointing up into

14  the tree.  Do you know what that represents?

15     A    I'd be speculating.

16     Q    Can you tell me, sir, looking at

17  Shecktor 10 where the ladder was set up at the time

18  of the incident?

19     A    I asked that question.  From the picture,

20  no.  All I know is that the gentleman said, when he

21  landed, he landed in the dirt.  So there's a -- near

22  this -- near concrete.  That's all I know.

23     Q    So getting back to my question, can you

24  tell me using Shecktor 10 as an example where the

25  ladder was set up at the time of the incident?

Page 89

1       A     No.

2       Q     Okay.  Would you agree with me that there

3    are a number of roots that come out of the bottom of

4    that tree --

5       A     Yes.

6       Q     -- and come out from all sides and create

7    an uneven --

8       A     Yes.

9       Q     -- surface -- surface?

10      A     Yes.

11      Q     Do you know if the bottom of the ladder was

12   on one of those tree roots at the time of the

13   incident?

14      A     What was the ladder resting on?  He said

15   dirt.

16      Q     Just dirt?

17      A     I said, Was it on dirt, driveway, concrete?

18   He said dirt.

19      Q     Did you ask him whether there was anything

20   on top of the dirt?

21      A     No.

22      Q     Is your opinion based upon an understanding

23   that the -- the bottom feet of the ladder were on a

24   relatively flat dirt surface at the time of the

25   incident?

1      A    Yes.

2      Q    Which way was Mr. Shecktor facing at the

3  time of the incident?

4      A    It's my understanding he was facing the

5  tree.

6      Q    Okay.  What were his body movements prior

7  to and at the moment of the incident?

8      A    He told me he was standing and lowering a

9  clipper.  It could be clipper or clipping.

10      Q    The facts that you relied upon in rendering

11  your opinions in this case, are they contained on

12  this first page of Hughes 7?

13      A    Yes.

14      Q    You said several times during your

15  testimony that Mr. Shecktor told you he was not

16  leaning.  He had not leaned at all; was that correct?

17      A    Yes.

18      Q    You said in response to an earlier question

19  that you believe Mr. Shecktor was about 12 feet up at

20  the time of the incident?

21      A    Yes.

22      Q    You believe it was on the twelfth -- was

23  that the twelfth rung, then?

24      A    Yes.

25      Q    That's what he told you?

1       A     How high extended?  12 feet.

2       Q     Well, the ladder was extended 12 feet?

3       A     I don't know.

4       Q     Do you know what rung he was on at the time

5   of the incident?

6       A     He said he fell 12 feet.

7       Q     He said he fell 12 feet.  So that by logic,

8   you assume that he had been on the twelfth rung?

9       A     Yes.

10      Q     You do not know the weight or the length of

11  the branch he was cutting at the time of the

12  incident?

13      A     No.

14      Q     Would it surprise you to know that he told

15  me in his deposition that that branch weighed

16  35 pounds that he was cutting at the time of the

17  incident?

18      A     Could you repeat that question?

19      Q     Would it surprise you to know that he told

20  me in his deposition that the branch weighed

21  35 pounds?

22      A     Doesn't surprise me, no.

23      Q     Okay.  In using a ladder to do an

24  operation, is it important for the user to set the

25  ladder up as close as possible to the area that they

1   intend to work on so that they don't have to reach

2   too far one way or another?

3        A    Yes.

4        Q    And that again, the consideration there is

5   that you don't want to do anything that makes the

6   ladder unstable in your use of it?

7        A    Yes.

8        Q    And the ladder says that you should keep

9   your body centered between the side rails for that

10  purpose?

11       A    Yes.

12       Q    I'm going to show you, sir, Mr. Shecktor's

13  deposition, Page 73, Line 19.  I only brought that

14  copy, sir.  So I'm going to come stand behind you.

15  Is that all right?  I'm not that imposing, but I'd

16  like to make sure.

17            What was the difference from where the

18  center of the ladder was to the branch?  Line 19.  I

19  was about at the 8-foot mark, and it was another 8

20  foot to the branch.  The length of that tool, going

21  to Page 74, basically -- so you could reach with the

22  tool, but it was about as far as you could reach with

23  it?  And he answered:  Right.

24            Is that what he told you when you asked him

25  what he was doing at the time of the incident, sir?

1      A    Well, it wasn't that much detail.  I didn't

2   have that much detail.

3      Q    Did he tell you that he had to reach about

4   as far as he could reach?

5      A    No.

6      Q    Do you know, had Mr. Shecktor done any

7   cutting on the branch that he was working on prior to

8   the incident?

9      A    I don't know.

10      Q    I'm going to point you to his deposition,

11   sir, Page 82, Line 10.  I said:  You indicated

12   previously that you had just completed cutting

13   through the branch.  Did the branch fall?  He

14   answered:  Now, this is where the story gets

15   interesting.  I want to give it to the order that you

16   require.  Yes, it fell.  And then -- let's see.  Did

17   the branch fall?  Did it fall straight down?  Sort

18   of.  It twisted as it fell.

19           Were you cutting from the top down or from

20   the bottom up?  The top down at the time.  You said

21   that the branch twisted.  Did it twist toward you?

22   Towards me, yes.  Did it -- any part of the branch

23   strike the ladder?  No.  Did any part of the branch

24   strike you?  No.  And as it twisted towards you, what

25   happened?  When it twisted toward me, it grabbed the

Page 94

1   tool and pulled me slightly off center, at which

2   point the ladder went a little bit to the right, and

3   I released the tool.  Then the ladder righted itself.

4           Did Mr. Shecktor tell you when you were

5   asking him how the accident happened whether the

6   branch, when it fell, had grabbed the tool and caused

7   the ladder to become unstable?

8       A    No.

9       Q    Do you know what happened to the feet of

10  the ladder when that part of the incident occurred?

11      A    No.

12      Q    Do you know if it remained flat on the

13  ground?

14      A    No.

15      Q    It appears that they did not land, keep

16  flat on the ground; is that true?

17      A    I can't make that speculation.

18      Q    It would be speculation to determine

19  otherwise, would it not?

20      A    I don't think I can make an opinion on

21  that.

22      Q    You've offered an opinion here that the

23  accident was caused by a defect and not through any

24  instability created on the ladder; is that correct?

25      A    Yes.

1    Q    And yet instability is one of the things

2    you have to rule out in a ladder accident; isn't that

3    correct?

4    A    Yes.

5    Q    And based upon this testimony, you can't

6    rule out instability as having been a cause of this

7    accident, can you?

8    A    Yes, I can.

9    Q    You can?

10   A    Yes.

11   Q    How is that?

12   A    I asked the gentleman:  How did -- did the

13   ladder fall to the left or to the right, and he said

14   no.  I said:  How did it fall?  He said:  The base

15   kicked out.

16   Q    But if that's true, it happened after this

17   incident occurred when the ladder moved back left and

18   right; is that correct?

19   A    Yes.

20   Q    And you don't know what the condition of

21   the feet was immediately after that happened; isn't

22   that true?

23   A    True.

24   Q    So if they were flat when he first set up,

25   you don't know whether they were still flat after

1  this part of the incident occurred --

2          MR. BERG:  I'm going to object.

3          MR. KUNSCH:  Okay.  You can object.

4          MR. BERG:  The objection is, you're not --

5  it said after the movement, it stabilized.  Let me

6  see the exact words on there --

7          MR. KUNSCH:  No, you're not going to coach

8  the witness, Phil.  If you have an objection, tell me

9  what the grounds of the objection --

10          MR. BERG:  The objection --

11          MR. KUNSCH:  What is the objection?

12          MR. BERG:  The objection is, you're

13  paraphrasing wrong what you just read to the person

14  being deposed.

15          MR. KUNSCH:  That's fine, but the witness

16  can still answer the question because you're the one

17  who didn't send him the transcript, not me.

18  BY MR. KUNSCH:

19      Q    You don't know what the condition of the

20  feet were immediately after the tree grabbed the

21  pruning sheers; is that correct?

22          MR. BERG:  Note my objection again

23  because --

24          MR. KUNSCH:  Do not make speaking

25  objections, Phil.  We can -- we can dismiss the

1   witness if you want to start talking, but you're not

2   going to coach this witness, not while I'm asking him

3   questions.  So state the legal basis for your

4   objection, and let's move on.

5           MR. BERG:  Because you're making statements

6   which are not what you read from that deposition.

7           THE WITNESS:  I'll leave.

8           MR. KUNSCH:  That's your testimony, Phil,

9   and the Judge is going to have to decide this in a

10  Daubert motion when he decides whether this witness'

11  opinion is going to go to a jury.  And you can make

12  your point at that time.  And you can also make your

13  point at the time we have to try this case, if we do.

14  But I'm -- I think my question has already been

15  answered.

16  BY MR. KUNSCH:

17      Q    After this part of the incident occurred

18  and you said that he told you the ladder kicked out,

19  did Mr. Shecktor move at all?

20      A    Repeat that.

21      Q    Yeah.  We talked about what Mr. Shecktor's

22  testimony -- you read Mr. Shecktor's testimony about

23  what happened while he was cutting this branch, and

24  he claims the ladder stabilized or whatever.  Did he

25  move after that and before he -- before the ladder,

1  you believe, kicked out?

2      A    I don't know.

3      Q    Would that be important to your opinions?

4      A    No.

5      Q    No?  So whether or not he was moving at the

6  time of the incident doesn't have any effect on what

7  happens?

8      A    No.

9      Q    And you believe -- it's inherent in your

10  opinion about the causation of this incident that the

11  ladder kicked out instead of moving to the left or

12  right; is that correct?

13      A    Yes.

14      Q    And if the ladder moved left or right, that

15  would be an indication that there was an instability

16  in the ladder; is that correct?

17      A    Yes.

18      Q    I'm going to show you, sir, Page 86 of

19  Mr. Shecktor's deposition.  It actually started on

20  Page 85, Line 12, sir:  After you let go of the tool,

21  what did you do with your right hand?  Answer:  My

22  right hand went back down the ladder, and I proceeded

23  to come down the ladder.  On a rung?  On a rung.  And

24  you started to come down the ladder?  Yes.  So you

25  understand now that he was actually moving down the

1   ladder before the ladder incident happened; is that

2   correct?

3        A    Yes.

4        Q    Okay.  Line 23, Page 85:  And then what

5   happened?  As I made my first step down the ladder,

6   the left side of the ladder dropped about an inch,

7   maybe two inches and destabilized me, and that's when

8   the ladder started to fall.  That's Mr. Shecktor's

9   testimony.  Is that not correct, sir?

10       A    Yes.

11       Q    So the ladder actually -- yep, you may.

12  You tell me when you're done.

13       A    (Witness reading.)

14       Q    And after that on Page 84, it says, Line 5:

15  How did it start to fall?  6:  It jumped and then

16  kind of bounced off the tree and jumped and was in

17  midair, and I was still trying to come down the

18  ladder.  And that's when the ladder fell to the left.

19  That's to my left.  So Mr. Shecktor testified that as

20  he was climbing down the ladder, the ladder shifted

21  to the left an inch or two inches; is that correct?

22       A    Yes.

23       Q    And then it destabilized him, is what he

24  said, correct?

25       A    Yes.

1    Q    And then he said the ladder fell to his

2    left; is that correct?

3    A    Yes.

4    Q    Did not kick out, did it?

5    A    According to the statement, no.

6    Q    And you testified a couple minutes ago,

7    sir, that if the ladder didn't kick out -- or strike

8    that question.  You testified a couple minutes ago

9    that you didn't believe instability caused a problem

10   because the ladder kicked out and didn't move left or

11   right.  Wasn't that your testimony?

12   A    Yes, it was my understanding that the

13   ladder kicked out.

14   Q    And now your understanding based upon the

15   sworn deposition testimony of Mr. Shecktor is that

16   the ladder actually moved left; isn't that correct?

17   A    Yes.

18   Q    And that's an indication of instability in

19   the ladder; is that not correct?

20   A    Yes.

21   Q    So asking the question I asked you a couple

22   minutes ago, sir, you can't rule out that this

23   incident was caused by instability in the ladder

24   created by the manner in which Mr. Shecktor was using

25   it; is that true?

1      A      According to that sworn statement, yes.

2      Q      When Mr. Shecktor fell, how did he fall?

3      A      He said he let go of the ladder and dropped

4  to his feet.

5      Q      He landed on his feet?

6      A      Yes.

7      Q      Where did the ladder end up?

8      A      It's my understanding on the lawn.  It

9  actually fell away from the tree.

10     Q      Straight back?  Was it part of your opinion

11 when you believed that it kicked out, sir, that it

12 came straight back?

13     A      It would have come back this way, yes.

14     Q      Come back, back towards the feet where the

15 feet were, not to the -- let me ask you the question

16 this way.  It was your understanding the ladder did

17 not go left or right; is that correct?

18     A      Correct.

19     Q      But you don't know exactly where it came to

20 rest; is that true?

21     A      No, correct, yes.

22     Q      Would it surprise you based upon the

23 testimony that I read for you and your prior

24 testimony that the ladder went left?

25     A      No, not now, no.

1          MR. KUNSCH:  Let's go off the record.

2                    - - -

3          (Whereupon there was a recess in

4      the proceedings.)

5                    - - -

6  BY MR. KUNSCH:

7      Q    I'm placing in front of you, sir, your

8  report which was -- we marked previously as Hughes 2;

9  is that right?

10      A    Yes.

11      Q    Okay.  If you would, sir, please turn to

12  page little I.

13      A    Yes.

14      Q    The summary page.  You say, second

15  paragraph, the results of the investigation.  The

16  investigation that you performed in this matter

17  consisted of the two phone calls that you had?

18      A    Right.

19      Q    And your review of the photographs that

20  were submitted that we marked as part of the package,

21  which is Hughes 7; is that correct?

22      A    Right, right.

23      Q    And your review of your book; is that

24  right?

25      A    Yes.

1      Q     Is that your investigation?

2      A     And a calculation, yeah.

3      Q     And, actually, we should talk about that.

4   In Hughes 7, it's the fifth page back.

5      A     Yes.

6      Q     There is a calculation -- there is a

7   drawing that you said was in your handwriting,

8   correct?

9      A     Yes.

10     Q     And it says -- can you tell me, on the left

11  side there's some words written there, what the words

12  are?

13     A     It says bolt too big.

14     Q     Bolt too big?

15     A     Right.  And then the calculation is the

16  page after that.

17     Q     Okay.  And are those the only drawings and

18  calculations?

19     A     Yes.  There should be another sheet right

20  here.

21     Q     Can I see the original?

22     A     Sure.

23           MR. KUNSCH:  Off the record.

24                         - - -

25           (Discussion held off record.)

1                        - - -

2   BY MR. KUNSCH:

3        Q    Okay.  Back on the record.  We've included

4   now with Exhibit 7 a missed -- a page that had been

5   missing when the copies were made.  It's a

6   calculation that you made.  What is the purpose of

7   that calculation?

8        A    I was concerned about this bolt being

9   oversized, too large.  Yeah, this is -- in my report,

10  I said that I have a concern about the defect of this

11  cleat, the shoe cleat here, the fact that this thing

12  can be orientated so if that bolt is too big and

13  there's only eight-thousandths of an inch tolerance

14  there, this can put a -- actually induce a horizontal

15  force into this location, and that's what I was doing

16  my calculations on.

17       Q    Okay.  Where did you get 150 pounds from?

18       A    Oh, that was the weight of the gentleman;

19  and if he was carrying something, it would only be

20  worse.  So I was being conservative here with that.

21       Q    Okay.  And back to your report where we

22  were a second ago.  If you can go to Page 1 under

23  background, please?

24       A    Yes.

25       Q    Second line down:  He had extended the

1   16-foot ladder upwards 12 feet and was 9 feet from

2   the top standing.  Do you mean bottom there or top?

3       A    From the bottom, yes.

4       Q    Okay.  It says in March 2011, you were

5   retained; is that correct?

6       A    Yes.

7       Q    And the last sentence talks about photos of

8   the revised shoe.  Do you know whether any of the

9   Louisville Ladders use the same shoe design now?

10      A    No.

11      Q    Okay.  Page 2 under investigation, please,

12  the last -- the third paragraph, second to last

13  sentence:  He stated his feet were approximately nine

14  feet off the ground.  Mr. Shecktor stated that he had

15  the base of the ladder no farther than three to four

16  feet from the base of the tree.  Do you know which

17  one it was?

18      A    No.

19      Q    Did you get that from Mr. Shecktor?

20      A    Yes.

21      Q    You talked about -- next paragraph starts

22  with a close-up inspection of the shoes.  That was

23  again you inspected black and white photocopies of

24  the shoes; is that correct?

25      A    Yes.

1      Q    You did not -- just so we're clear -- and

2   I'm talking about your report -- you did not ever

3   look at the ladder, correct?

4      A    Correct.

5      Q    Okay.  Under discussion:  Thousands of

6   people become injured each year in this country from

7   reckless use of ladders.  Where did you get that

8   statement, or is that just yours?

9      A    That's mine.

10     Q    And then you talk about OSHA, some OSHA

11  regulations; is that correct?

12     A    Yes.

13     Q    Was this a workplace setting?

14     A    No.

15     Q    I'm just asking questions.  I'm not being

16  critical.

17     A    No, no, no.  I was just trying to --

18     Q    Okay.  Segueing into my question, does OSHA

19  apply in a non-workplace situation?

20     A    No.

21     Q    Okay.  Do you know whether OSHA has adopted

22  the ANSI A 14 standards promulgated by the American

23  Ladder Institute?

24     A    There's a lot of overlap there.  I mean, I

25  can't say unequivocally word for word that they have

1   adopted it.

2       Q    Okay.  Under conclusions Page 3, it says:

3   Based on the physical evidence at the site -- again,

4   this is based upon the black and white photocopies of

5   pictures that are attached to Hughes 7, correct?

6       A    Correct.

7       Q    And a review of industry standards.  What

8   industry standards are you talking about?

9       A    My industry standards were looking at

10  competitors' designs.

11      Q    Okay.

12      A    Plus the development of those calculations,

13  you know, that I developed there.

14      Q    And your own publication and that's your

15  book that's here in front of you, correct?

16      A    Yes.

17      Q    Number 2 it says:  Mr. Shecktor was not

18  doing anything abnormal at the time of the incident.

19  Do you still believe that?

20      A    I think the failure mechanism is somewhat

21  different than what I originally thought.  I did not

22  read that deposition.  So you only showed me a few

23  pages.  I'd have to read the whole thing to form an

24  opinion.

25      Q    Do you believe that what Mr. Shecktor was

1   doing before the accident was abnormal?

2       A    I don't know yet.  I'd have to -- based on

3   what I was given here, no.

4       Q    How about based upon the testimony that you

5   read today?

6       A    I would like to see the -- I'd like to read

7   that whole thing through, yes.

8       Q    Let me see your book.

9       A    Oh, sure.

10      Q    For the record, Mr. Hughes has given me the

11  actual publication of his book, "Building Design and

12  Construction Hazards".  Chapter 30, sir, deals with

13  ladder, scaffoldings, and platforms; is that true?

14      A    Correct.

15      Q    Do you mind if I come behind you again

16  since there's only one copy of the book?

17      A    No.

18      Q    At least for today.

19                       - - -

20          (Discussion held off record.)

21                       - - -

22  BY MR. KUNSCH:

23      Q    For the record, Mr. Hughes was kind enough

24  to copy many pages of Chapter 30 for me.  This will

25  make it easier for us to kind of talk about some of

1   this.  If you could go to 442 under 10.2 ladders --

2   30.2 -- I'm sorry -- it is.  First sentence:  Most of

3   the investigations that involve ladders are as a

4   result of negligence by the operator.  Is that what

5   you wrote?

6        A    Yes.

7        Q    Either improper use or hazardous setup

8   conditions result in the problems.  Is that what it

9   says?

10       A    Yes.

11       Q    If you keep going down:  Ladders at times

12  slip off the surface of which they are initially

13  resting on causing the user to fall.  Were the shoes

14  on the ladder slip resistant.  Was the ladder tied

15  off?  Was the bearing surface stable?  Overreaching

16  is often the problem.  While on a ladder, one's

17  center of gravity should never be outside the rails.

18  Did I read all that correctly?

19       A    Correct.

20       Q    Those are always considerations, primary

21  considerations to ask when analyzing a fall from a

22  ladder; is that correct?

23       A    Yes.

24       Q    If you go to Page 443, the second full

25  paragraph from the bottom:  Ladders are not intended

1  for use by people when carrying materials, tools, or

2  other items; is that true?

3      A    Yes.

4      Q    Other than going to Lowe's and looking at

5  these other ladders and manufacturers and their

6  designs, did you do any kind of climbing tests with

7  any of those ladders?

8      A    No.  I developed calculations, engineering,

9  you know, science calculations.

10     Q    The ones that we've referred to?

11     A    Right, right, which would show -- I had to

12 calculate to be able to determine what the forces

13 were into that -- the horizontal, vertical force

14 components.

15     Q    Right.  Did you evaluate the designs in

16 conjunction with analysis of whether they were able

17 to, you know, account for some differences in the

18 surface of the ground?

19     A    Regardless if one shoe is -- if they're not

20 perfectly flat on the ground, if the ladder is not

21 perfectly flat, that slot plays a role.  I mean,

22 that's the problem that I have.  I have a problem

23 with the -- not the slot itself, but the -- the angle

24 of it.

25     Q    Okay.  And can you say to a reasonable

1    degree of engineering certainty that the issue with

2    the slot caused Mr. Shecktor's accident?

3         A    I would have to go back and review those

4    statements, so, no.

5              MR. KUNSCH:  I have no further questions

6    for Mr. Hughes.

7              MR. BERG:  I have no questions.

8              MR. KUNSCH:  Thank you.

9

10                        - - -

11              (Proceedings concluded at 12:20 p.m.)

12                        - - -

13              (Signature reserved.)

14                        - - -

15

16

17

18

19

20

21

22

23

24

25

Page 112

1    COUNTY OF LYCOMING                    :

                                           :   ss

2    COMMONWEALTH OF PENNSYLVANIA     :

3        I, LAURA M. BRUNER, Reporter-Notary

4    Public, authorized to administer oaths within and

5    for the Commonwealth of Pennsylvania and take

6    depositions in the trial of causes, do hereby

7    certify that the foregoing is the testimony of

8    RICHARD T. HUGHES, PE.

9        I further certify that before the taking

10   of said deposition, the witness was duly sworn; that

11   the questions and answers were taken down

12   stenographically by the said LAURA M. BRUNER, a

13   Reporter-Notary Public, approved and agreed to, and

14   afterwards reduced to typewriting under the

15   direction of the said Reporter.

16       I further certify that the proceedings and

17   evidence are contained fully and accurately in the

18   notes taken by me in the within deposition, and that

19   this copy is a correct transcript of the same.

20       In testimony whereof, I have hereunto

21   subscribed my hand this 20th day of July 2011.

22

23

                      LAURA M. BRUNER

24                    Notary Public

25   My commission expires on September 15, 2013

| & |
|---|
| **&**  2:7 3:18,20 20:11 |

| 0 |
|---|
| **0001**  15:23 |
| **0092**  15:24 |

| 1 |
|---|
| **1**  3:9 9:8,13 12:3 |
| 21:2 88:10 104:22 |
| **1.0**  54:12 |
| **10**  37:6 87:19 88:17 |
| 88:24 93:11 |
| **10.2**  109:1 |
| **107**  1:11 7:10 |
| **11**  88:7 |
| **11th**  37:25 |
| **12**  1:9 2:3 3:11 82:4 |
| 82:8 90:19 91:1,2,6 |
| 91:7 98:20 105:1 |
| **12:20**  111:11 |
| **14**  106:22 |
| **14.2**  29:5 69:8,11,15 |
| 69:19,23,25 70:4 |
| **14th**  37:23 |
| **15**  7:18 37:6 112:25 |
| **150**  104:17 |
| **1515**  2:8 |
| **154**  73:17 |
| **16**  7:18 67:9 82:7 |
| 105:1 |
| **16/19**  4:5 |
| **16830**  1:12 |
| **17**  3:11 |
| **18**  67:8 |
| **1800**  1:24,24 |
| **19**  25:24 92:13,18 |
| **19102**  2:8 |
| **19103**  1:25 |
| **19444**  2:3 |
| **1981**  33:15 |
| **1987**  24:3 |
| **1996**  33:15 |
| **19th**  2:8 |

| 2 |
|---|
| **2**  3:9,11,13,21 12:7 |
| 12:14 19:1 21:4 |
| 32:20 37:22 67:7 |
| 88:13 102:8 105:11 |
| 107:17 |
| **20**  8:15 36:11 41:10 |
| **2002**  21:7 |
| **2003**  25:25 |
| **2005**  20:13 |
| **2006**  38:15 |
| **2007**  18:25 |
| **2008**  25:25 38:23 |
| **2010**  38:15,23 60:25 |
| **2011**  1:9 12:10 |
| 13:23 14:16 15:22 |
| 35:2 37:23 38:25 |
| 40:4 42:4,4,7,11 |
| 53:1 105:4 112:21 |
| **2013**  112:25 |
| **209**  1:5 |
| **20th**  14:16 112:21 |
| **21**  18:25 |
| **215**  2:9 |
| **22nd**  13:16 |
| **23**  99:4 |
| **24**  19:1 |
| **24th**  14:20 |
| **2500**  10:5 11:2 |
| 13:22 |
| **25th**  13:19 |
| **26**  9:24 11:23 39:8 |
| 39:19 40:2,24 |
| **2nd**  53:1 |

| 3 |
|---|
| **3**  3:13 31:13,19 |
| 107:2 |
| **3-2-11**  52:4,5 |
| **3-8-11**  12:12 |
| **3/8/11**  3:11 |
| **30**  3:18,20 8:12 |
| 35:20 36:2 48:16 |
| 49:12 50:16 108:12 |
| 108:24 |

| 30.2  109:2 |
|---|
| **31**  3:13 |
| **35**  91:16,21 |
| **38**  3:15,16 |

| 4 |
|---|
| **4**  3:15,16 37:24 38:5 |
| 38:6,14,18 40:12 |
| 41:6,6 42:4,6 43:3 |
| 69:3 |
| **4-14-11**  38:3 |
| **4/14/11**  3:15 |
| **40**  35:19 |
| **43**  48:21 |
| **442**  109:1 |
| **443**  109:24 |
| **466**  1:5 |
| **482**  3:18 49:12 |
| **483**  3:18 49:8,12 |
| **49**  3:18 |
| **4th**  50:24 53:5 |
| **4x6**  3:13 31:17 |

| 5 |
|---|
| **5**  3:3,15,16 4:8 |
| 24:24 37:25 38:3,8 |
| 38:22 40:15 41:2,11 |
| 41:25 57:12,21 |
| 99:14 |
| **50**  3:20 35:20 |
| **500**  14:7 |
| **54**  73:17 |
| **555**  2:3 |
| **57**  3:21 |

| 6 |
|---|
| **6**  3:18 49:8,14 50:11 |
| 86:22 99:15 |
| **610**  2:4 |
| **650**  11:11 |

| 7 |
|---|
| **7**  3:20 50:8,14,18 |
| 53:2,20 54:11 77:14 |
| 87:5 90:12 102:21 |
| 103:4 104:4 107:5 |

| 7-11-11  38:6 |
|---|
| **7-12-11**  57:16 |
| **7/11/11**  3:16 |
| **7/12/11**  3:21 |
| **73**  92:13 |
| **74**  92:21 |
| **75**  74:10,11 |

| 8 |
|---|
| **8**  3:21 9:24 12:9 |
| 13:22 57:14,18 |
| 60:24 92:19,19 |
| **82**  93:11 |
| **825-3134**  2:4 |
| **84**  99:14 |
| **85**  98:20 99:4 |
| **86**  98:18 |
| **8th**  52:19 |

| 9 |
|---|
| **9**  3:9 9:24 105:1 |
| **9,000**  61:16 |
| **963-2481**  2:9 |

| a |
|---|
| **a.m.**  1:12 |
| **able**  110:12,16 |
| **abnormal**  65:7 |
| 107:18 108:1 |
| **academy**  31:24 |
| **accept**  39:20 |
| **accident**  56:16,21 |
| 56:25 59:5 63:1,2 |
| 64:9 71:1,12 73:4 |
| 73:19 80:8 83:7 |
| 85:20 94:5,23 95:2 |
| 95:7 108:1 111:2 |
| **accidents**  37:11 |
| 48:20 61:15 82:17 |
| **account**  110:17 |
| **accuracy**  67:7 |
| **accurately**  112:17 |
| **action**  1:4 11:16 |
| **active**  47:25 48:6 |
| **actively**  21:7 |

**actual** 17:15 108:11
**addition** 12:19
  18:10 33:23
**additional** 21:9,13
  21:18,20
**additions** 21:16
**administer** 112:4
**adopted** 106:21
  107:1
**advertise** 36:25
**advise** 25:20
**advises** 87:12
**advisor** 25:16
**affiliated** 37:4
**afraid** 79:2 85:25
**age** 55:7
**ago** 5:19 79:12
  100:6,8,22 104:22
**agree** 12:9 15:6 54:5
  55:1 56:15,20 63:21
  69:4,10 89:2
**agreed** 5:1 112:13
**ahead** 50:25 61:17
**air** 23:12,14
**allstate** 34:12
**aloi** 58:8
**alter** 86:8
**aluminum** 46:11,12
  47:21 51:11
**amended** 3:9 9:11
  14:19
**american** 31:15,23
  106:22
**amount** 10:12
**analysis** 64:5 110:16
**analyzed** 29:17
**analyzing** 109:21
**andorra** 2:3
**andrew** 1:4 5:18
  16:23
**andy** 52:13 53:9
**angle** 74:10,11,17
  110:23
**angles** 32:17

**ansi** 25:12 29:5 32:1
  66:5 69:8,11,12,15
  69:19,22,24 70:3
  74:10 106:22
**anstasi** 60:6,13
**answer** 4:2 6:21
  21:11 22:20 23:1
  36:18 44:16 55:9,11
  56:11 96:16 98:21
**answered** 92:23
  93:14 97:15
**answering** 22:23,25
**answers** 112:11
**anybody** 39:25
**appears** 11:12 40:12
  94:15
**apply** 106:19
**appreciate** 6:22
**approve** 37:13
**approved** 112:13
**approximately** 8:15
  25:25 44:12 78:18
  105:13
**approximating** 6:24
**approximation** 6:22
  6:23
**april** 37:23
**arbitration** 39:10
  40:12 41:3
**architectural** 8:5
**area** 26:3,19 28:3
  29:2 54:8 91:25
**areas** 26:22 37:7,13
**arising** 5:18
**arizona** 20:17
**arms** 78:10 79:13
**arrest** 76:8
**arrive** 54:20
**arrow** 88:13
**articles** 24:18 28:17
**aside** 31:14
**asked** 11:14,17,22
  11:24 13:3,6 16:13
  20:19 40:25 43:1
  51:3,12 55:5,6,24

64:12,25 65:5,6,13
  66:21 67:1,1,17,21
  68:1 72:4 74:8 76:2
  76:5,24 77:23,24,25
  78:1,2 80:1,11
  84:24 85:24,25 86:2
  88:19 92:24 95:12
  100:21
**asking** 22:22 40:22
  40:24 63:8 78:2
  80:14 94:5 97:2
  100:21 106:15
**asks** 41:18 67:15
**asphalt** 64:22
**assignment** 10:4,6
  10:19
**assignments** 10:2
  11:9
**assistant** 57:10
**assume** 91:8
**assumed** 87:25
**assumption** 15:17
**astm** 25:12 32:4
**atlantic** 43:14
**attached** 14:18
  20:25 21:3 77:13
  107:5
**attention** 17:6,17
**attic** 47:18 48:2
**attorney** 5:16 18:25
  61:1
**attorneys** 39:24
**author** 17:7
**authored** 12:23 45:4
**authoring** 16:1 31:6
**authoritative** 29:5,8
**authority** 29:12
**authorized** 112:4
**automobile** 8:22
  59:20
**automotive** 23:15
**available** 20:7 55:12
**avocation** 27:2
**aware** 16:12 25:8
  39:15 40:23 55:18

**b**

**b** 1:5 3:5 31:13 59:3
**back** 12:20 18:2
  19:17 36:11 41:9,20
  44:7 47:22 48:20
  57:21 64:14 86:10
  88:23 95:17 98:22
  101:10,12,13,14,14
  103:4 104:3,21
  111:3
**background** 54:3,12
  104:23
**baldwin** 57:23
**ball** 61:18
**base** 74:22 76:6
  95:14 105:15,16
**based** 13:2 26:20
  59:24 63:10 89:22
  95:5 100:14 101:22
  107:3,4 108:2,4
**basic** 51:12
**basically** 41:17 51:4
  92:21
**basis** 97:3
**bathroom** 42:19
**bearing** 66:19 72:10
  109:15
**bearings** 70:11,12
**beaver** 33:19
**began** 32:10
**begins** 17:19
**behalf** 5:20 43:2
**believe** 15:21 18:4
  19:11 26:15 31:1
  50:8 51:17,23 52:25
  53:5 62:4 76:25
  77:2 90:19,22 98:1
  98:9 100:9 107:19
  107:25
**believed** 101:11
**belong** 26:10
**berg** 2:2,2 9:2,4 11:2
  13:17,20 14:16
  15:11 16:15,21 19:8

39:18 40:3,22 41:13
47:10 48:11 49:4
50:12 52:6,22,25
53:6 54:16 57:5
63:4,11,11 65:20
66:14 67:16 96:2,4
96:10,12,22 97:5
111:7
**berg's** 11:13 14:13
**berwick** 10:24
**better** 43:16
**beyond** 26:17
**big** 26:10 49:25
83:11 103:13,14
104:12
**biggest** 10:14
**binder** 50:6
**bit** 6:10 71:21 94:2
**black** 77:15 88:2
105:23 107:4
**body** 25:15 77:21
78:1,3 81:14 87:7
90:6 92:9
**bolen** 62:12
**bolt** 103:13,14 104:8
104:12
**book** 19:23 20:3,4,7
48:12,16 49:9 51:4
82:16 102:23
107:15 108:8,11,16
**books** 24:18 28:17
**bottom** 17:9 30:7
63:6 64:19 66:16,17
66:20 72:11 76:4,17
76:18,21,22 89:3,11
89:23 93:20 105:2,3
109:25
**bounced** 99:16
**box** 45:17
**branch** 22:13 91:11
91:15,20 92:18,20
93:7,13,13,17,21,22
93:23 94:6 97:23
**brand** 68:18

**break** 7:1,3 42:18
42:19
**bree** 15:21 57:7
**bree's** 78:17
**bridges** 8:14 22:7
**brief** 6:3
**briefly** 28:16 63:4
**bring** 9:19 26:15
61:19
**brittain** 58:2,2
**broad** 22:9
**broaden** 43:4
**brothers** 33:2,8
**brought** 5:17 13:9
40:1 57:10 92:13
**bruner** 1:12 112:3
112:12,23
**building** 8:23 19:24
24:21 32:15,16 37:9
49:9 58:7 59:8 60:3
60:4 62:18 108:11
**buildings** 8:13,14,18
8:22 21:7,18,23
22:8 24:18 33:10
34:4 35:10
**buried** 45:5
**business** 7:15 8:10
10:13 33:8 45:12,19
51:6

**c**

**c** 2:1 58:5,25 59:9
**calculate** 110:12
**calculation** 103:2,6
103:15 104:6,7
**calculations** 103:18
104:16 107:12
110:8,9
**call** 8:24 12:18
48:12 52:23 53:7
63:11 76:21
**called** 16:23 49:4
52:22
**calls** 6:12 102:17

**captions** 41:23
**care** 16:19
**career** 55:16
**carriers** 34:10,10
**carrying** 64:16
78:25 79:1 85:24
104:19 110:1
**case** 10:9,21 11:15
12:10,23 14:4 16:2
16:11 19:15 26:17
28:21 29:9,16,19
31:7 37:19,22 41:22
43:25 44:10,14
45:20 46:1,1,7 51:3
51:24 55:22 58:24
59:7,16,22 60:4,8
60:25 61:3 69:14
84:3 90:11 97:13
**cases** 11:15 17:5
37:16 39:9 41:18
43:21 44:5,9,13,17
44:17,18,19 45:4,24
46:5,17,20 47:25
56:10
**cash** 34:13
**casualty** 34:12
**causation** 63:22
98:10
**cause** 56:16,25 63:1
63:2,24 64:2 82:20
86:10 95:6
**caused** 66:25 67:2
82:18 85:4 86:20
94:6,23 100:9,23
111:2
**causes** 64:1 112:6
**causing** 109:13
**caution** 87:10
**ceiling** 47:16
**center** 92:18 94:1
109:17
**centered** 87:7 92:9
**cernics** 59:1
**certain** 10:11 87:12

**certainty** 111:1
**certification** 5:3
**certifications** 25:9
**certify** 112:7,9,16
**chance** 22:25
**changed** 64:10
**chapter** 3:18 48:16
48:21 49:12 108:12
108:24
**charge** 10:2,2,3,11
10:18 11:8
**charleston** 11:3
**check** 14:9
**checked** 76:13
**choosing** 83:2
**circle** 88:7,10
**cisney** 58:25
**cited** 79:5
**city** 11:3
**civil** 1:4 11:16 22:3
22:5,6,19 26:13
27:2 33:12 37:9
39:7
**claims** 97:24
**classes** 22:16
**classify** 10:7
**cleaning** 83:9
**clear** 14:2 17:21
41:8 106:1
**clearfield** 1:12 7:10
**cleat** 29:23 70:22
76:21 104:11,11
**cleats** 30:7 65:3
66:16,22,23 69:21
70:13 72:19
**clemente** 59:9
**cleveland** 11:4
**climb** 73:10 78:6,9
79:13,14
**climbed** 79:9,24
81:3 82:10,11 84:6
**climbing** 79:18
99:20 110:6
**cline** 61:7

**clip** 50:6
**clipper** 79:3,5 81:18
  81:22,24 83:24
  84:25 90:9,9
**clipping** 90:9
**close** 17:6 91:25
  105:22
**closed** 45:16
**coach** 96:7 97:2
**coast** 43:20
**code** 58:7 59:8 62:19
**codes** 37:10,10
**colin** 61:7
**collapsed** 8:21
**collection** 50:7
**college** 11:5
**color** 3:13 15:5
  31:17 49:24 77:18
**columns** 32:17
**come** 51:4 61:14
  64:23 89:3,6 92:14
  98:23,24 99:17
  101:13,14 108:15
**commencing** 1:12
**commercial** 51:9
**commission** 112:25
**committee** 25:15
**committees** 32:2,5
**commonwealth** 1:13
  112:2,5
**communicate** 41:15
**communication**
  50:22
**communications**
  63:14,15 65:24
**companies** 8:19
  10:9 21:22 32:14
  45:9
**company** 1:24 20:10
  20:11 36:14
**competitors** 107:10
**complete** 12:25 13:4
  32:23 67:14 69:23
**completed** 93:12

**compliance** 74:9
**component** 56:16,18
**components** 27:9,12
  27:23 68:5 110:14
**computer** 30:16
**concern** 104:10
**concerned** 104:8
**concerning** 64:7
**concerns** 68:22
**concluded** 111:11
**conclusions** 67:12
  107:2
**concrete** 17:13
  24:16,16 64:22
  88:22 89:17
**condition** 72:8
  73:21 77:11 95:20
  96:19
**conditioning** 23:12
**conditions** 109:8
**conduct** 65:20
**conducted** 65:22
**conference** 30:15
  53:7 63:11
**conferences** 28:8,9
**confidential** 3:15,22
  16:7,17 38:3 57:16
**confidentiality**
  16:10,14
**confirm** 21:2 67:6
**conformance** 69:7
**conforms** 69:11
**conjunction** 19:24
  110:16
**connect** 75:19
**conservative** 104:20
**consider** 26:19,22
  29:5,7,11 39:5 47:6
**consideration** 10:17
  92:4
**considerations**
  109:20,21
**considered** 10:20
**consisted** 102:17

**construction** 19:25
  21:19 24:22 28:8
  34:4 37:10 49:9
  58:1,4,10 59:2,7,11
  59:17 108:12
**consulting** 7:17
**consumer** 27:6
**contact** 48:11 52:21
  66:5,8,10,11,20
  70:21,24 72:6,8,22
  75:13,23,25 76:23
  77:5
**contacted** 36:3
  62:20,25
**contacting** 75:8
**contacts** 63:10
**contain** 12:25 13:4
  21:13
**contained** 28:16
  90:11 112:17
**contains** 24:17
  38:22 41:25
**continue** 50:10,25
  60:23
**conversation** 50:12
  52:5,20
**conversations** 9:5,6
  65:20 66:14
**cooperate** 6:10
**copies** 15:5 49:22,23
  50:2 53:20 104:5
**copy** 12:9 13:13
  16:9 17:22 19:23
  20:4 21:1,5 39:19
  48:22 49:24 52:1
  60:24 92:14 108:16
  108:24 112:19
**correct** 13:23 14:7
  14:21,24,25 15:24
  18:12,13,15 19:8,9
  20:1,5,6 21:5 24:19
  38:1,23,24 49:10,16
  49:20 50:3,14,20
  51:14,15,19,24 53:2
  53:3,12,13,15,16

  54:7 55:16 57:12,13
  65:18 68:20 69:9
  73:1,2 74:17,20,23
  77:1,4,10,16 78:19
  79:16 81:1 82:18,23
  83:2,7 90:16 94:24
  95:3,18 96:21 98:12
  98:16 99:2,9,21,24
  100:2,16,19 101:17
  101:18,21 102:21
  103:8 105:5,24
  106:3,4,11 107:5,6
  107:15 108:14
  109:19,22 112:19
**correctly** 74:7
  109:18
**council** 28:9
**counsel** 5:2
**country** 106:6
**county** 112:1
**couple** 54:23 100:6
  100:8,21
**course** 45:12 74:11
**courses** 23:8,23
**court** 1:1,24 2:3 6:7
  11:19 39:9 43:10,10
  47:4 64:6
**cover** 20:4,4 54:25
  55:2
**covered** 20:20
**covers** 22:15 23:21
**cranes** 20:18
**create** 89:6
**created** 94:24
  100:24
**cribbs** 58:5
**critical** 106:16
**criticisms** 72:25
**crossroads** 58:15
**current** 10:1 21:5,14
  21:15 24:8
**curriculum** 12:19
  20:25 21:3,5
**custom** 58:9

**cut** 81:25 84:6
**cutting** 83:10,11,14
 91:11,16 93:7,12,19
 97:23
**cv** 1:5 21:6,12,14,17
 24:6,17 28:16 32:10
 32:20

**d**

**d** 3:1 59:25
**damaged** 64:15
 67:24
**data** 48:12,21 49:3,8
 50:10
**date** 1:12 14:22 16:5
 50:22 51:5 53:4
 55:8 67:24 68:9,14
 71:11 73:4
**dated** 13:22 14:16
 18:25 37:23,25 52:3
 52:8,10
**daubert** 97:10
**david** 19:24 20:15
 20:16 61:25 62:5
**day** 22:24 54:8
 55:10 71:1 73:19
 81:6 112:21
**days** 68:8
**deal** 38:18
**deals** 108:12
**death** 86:25
**decide** 97:9
**decides** 97:10
**defect** 94:23 104:10
**defective** 19:2 21:22
 46:6 56:22
**defendants** 2:10
**defense** 43:24 59:16
 60:8,15
**degree** 22:2,14,15
 23:22 74:10,11
 111:1
**degrees** 22:3
**demanding** 39:22

**depends** 26:6
**deposed** 5:25 96:14
**deposition** 1:11 3:9
 4:1 5:22 9:1,8,11,19
 13:9 14:7,10,13,19
 14:19 19:6 39:10
 40:5,13 41:3 53:18
 53:22 54:2 55:19,22
 87:18 91:15,20
 92:13 93:10 97:6
 98:19 100:15
 107:22 112:10,18
**depositions** 6:3 39:6
 55:18 56:2 112:6
**depot** 19:11
**described** 20:22
 63:5 79:7
**description** 3:7 79:5
**design** 19:24 21:7
 21:19 22:6,11,12
 23:12,13,17 24:15
 24:16,22 27:5 29:3
 29:8,12,23,23 34:3
 34:17 35:7 36:3
 46:23 47:7,8 49:9
 60:4 69:23 70:13,15
 70:16 105:9 108:11
**designed** 21:7 27:8
 27:11,16
**designing** 8:13
 33:10
**designs** 107:10
 110:6,15
**despite** 16:14
**dessove** 59:25
**destabilized** 99:7,23
**destroyed** 45:12
**detail** 41:18 64:24
 93:1,2
**detailed** 13:25 14:3
**determine** 67:23
 94:18 110:12
**determined** 56:24
 74:16

**determining** 10:18
 59:23
**developed** 15:19
 107:13 110:8
**developing** 30:2
 52:18
**development** 107:12
**device** 48:2
**devices** 23:13
**devoted** 34:16
**difference** 92:17
**differences** 110:17
**different** 22:12,18
 22:19 23:10 25:20
 30:5,6,7 35:14 36:4
 39:6 107:21
**differentiating**
 35:14
**dig** 36:11
**direction** 4:2 112:15
**dirt** 88:21 89:15,16
 89:17,18,20,24
**discipline** 22:17
 32:8
**disciplines** 23:21
**discussed** 28:16
 73:21
**discussion** 8:7 19:19
 25:3 48:14,25 60:20
 103:25 106:5
 108:20
**dismiss** 96:25
**dispute** 58:1,4,7,10
**disrespect** 22:20
**distance** 10:11,14,17
**distributor** 51:8
**district** 1:1,2
**document** 11:17
 12:6 16:16,25 17:7
 45:8,10,11,13
**documents** 4:4 12:2
 13:11 15:22,23
 16:17 17:19 37:22
 49:19,23 50:1,8
 54:18,19 63:17

**doing** 8:16 32:12
 33:18 35:10 65:7
 82:22 83:8 92:25
 104:15 107:18
 108:1
**donegal** 34:13
**doorway** 59:6
**dozen** 35:10
**dozens** 17:4 36:3
**draw** 67:11
**drawing** 18:20,22
 103:7
**drawings** 103:17
**drawn** 88:1
**driveway** 89:17
**drop** 47:15
**dropped** 99:6 101:3
**drunk** 79:1,2 85:25
**duly** 5:9 112:10

**e**

**e** 2:1,1 3:1,5 58:5,25
 59:3,9,9,9,12,25,25
**earlier** 44:16 52:10
 57:9 66:2 77:24
 90:18
**easier** 108:25
**east** 43:20
**editing** 28:23
**effect** 7:5 98:6
**eight** 104:13
**either** 41:13 76:3
 109:7
**elect** 70:19
**electrical** 22:16,17
 23:23
**elk** 58:9
**email** 41:13
**emails** 14:12 19:8
**emphasis** 33:13
**employed** 33:1
**employees** 7:22
 61:16
**employers** 34:1

**employment** 32:21
32:24 33:14
**enclosed** 53:20
54:11
**encompasses** 22:6
**ended** 17:13
**engagements** 28:13
**engineer** 9:25 20:16
23:11 24:1 33:6,9
33:12 36:2 39:12,13
**engineering** 7:14,16
7:20 8:4,5,11 22:4,4
22:5,6,9,10,14 23:5
23:6,7,8,19,20,24
26:13,24 27:1,2,3
28:1,4 32:12 33:11
33:16,19 34:17,19
35:16 110:8 111:1
**engineers** 7:17,24
22:11,17,18,19 23:8
25:20 31:15
**entire** 20:21,22
**envelopes** 54:24
**erected** 51:7
**eric** 62:4
**erie** 11:5 34:12
**error** 60:14
**esquire** 2:2,7
**essential** 63:22
**essentially** 34:1
**estimate** 35:13
43:16
**evaluate** 110:15
**everett** 34:13
**evidence** 48:3 107:3
112:17
**exact** 6:21 40:8
83:18 87:21 96:6
**exactly** 14:23 36:5
40:18 101:19
**examination** 5:12
**examined** 5:9
**example** 88:24
**excuse** 25:25 71:20

**execute** 16:16
**exercise** 83:14
**exert** 84:21,22
**exhibit** 3:7 9:13
12:14 21:2 31:19
38:5,8 49:14 50:18
57:18 104:4
**exhibits** 19:6 53:21
**exist** 51:6
**existence** 7:18
**experience** 74:13
**expert** 5:20 26:23
36:20 39:8,21 46:22
46:25 47:4,6 49:25
67:4 84:16,17
**expertise** 8:3 20:17
26:3,19 37:7,13
**experts** 41:15
**expires** 112:25
**explain** 71:9
**explained** 39:11,13
**explaining** 39:15
**explanation** 6:12
**explanatory** 87:15
**extend** 75:2,4
**extended** 74:25 91:1
91:2 104:25
**extension** 45:1
46:15,16,18 51:11
82:7
**exterior** 62:18
**eyewitnesses** 86:1

**f**

**f** 59:12
**facets** 28:20
**facing** 90:2,4
**fact** 56:20 65:25
71:22 104:11
**factor** 11:1
**facts** 13:1 29:18
90:10
**fail** 64:13,13
**failed** 46:8,9 47:3

**failure** 32:17 66:19
66:20 86:23 107:20
**fair** 65:16 73:7
**fall** 58:17 60:9 93:13
93:17,17 95:13,14
99:8,15 101:2
109:13,21
**falls** 33:20
**far** 34:25 92:2,22
93:4
**farm** 34:12
**farther** 105:15
**fashion** 10:7
**fax** 18:24
**faxed** 14:15
**federal** 11:19 39:7,8
39:19,20 40:2,23
43:10
**fee** 10:1 11:2,7
**fees** 11:9
**feet** 67:9,9 72:22
76:15,17,18,24 77:8
82:4,8 83:25 86:13
89:23 90:19 91:1,2
91:6,7 94:9 95:21
96:20 101:4,5,14,15
105:1,1,13,14,16
**fell** 63:7 91:6,7
93:16,18 94:6 99:18
100:1 101:2,9
**fiberglass** 46:10
47:21
**field** 8:3 27:25
**fifth** 103:4
**file** 13:8,14 20:21,22
30:12 41:4 47:23
49:20,24 50:1,3
**filed** 45:16
**files** 36:11,12,13,14
41:21 45:5,6,18
**filing** 5:4
**find** 40:6 42:12
61:23
**findings** 64:7

**fine** 96:15
**finish** 83:14
**fireman** 74:12
**firm** 7:17 33:17
**firms** 33:18
**first** 5:9,24 6:10
13:7 18:2 32:11,13
33:1 38:15 40:1
48:10 49:4 51:2
52:5,21 57:22 60:10
68:11,12 90:12
95:24 99:5 109:2
**five** 25:22 30:18
**fixed** 51:10
**flat** 71:1,5,11 72:11
72:12 77:2 89:24
94:12,16 95:24,25
110:20,21
**floor** 2:8
**flooring** 70:23
**flows** 23:9
**fluid** 23:9
**fly** 74:22,25 75:4
76:6
**focusing** 64:11
**follow** 86:24
**followed** 81:12
**follows** 5:10
**foot** 18:11,21 45:21
82:7 92:19,20 105:1
**force** 84:23 85:4
104:15 110:13
**forces** 110:12
**ford** 59:18
**foregoing** 112:7
**forensic** 8:16 26:12
31:24 32:10,12
34:17,25 35:15,17
35:19 36:13 45:9
**forensics** 35:4
**forge** 60:16
**form** 5:5 107:23
**formal** 27:4
**forth** 86:10

**forthcoming** 56:3
85:23
**forwarded** 41:17
**foundation** 25:19,20
**foundation's** 28:8
**four** 7:23 31:1 41:2
72:7 105:15
**fourth** 52:22
**frame** 44:24
**frawley** 59:12
**front** 1:11 7:10 12:4
19:23 67:2 69:13,24
102:7 107:15
**full** 109:24
**fully** 40:23 112:17
**function** 10:13
**fundamental** 23:7
**further** 111:5 112:9
112:16

**g**

**gas** 18:3
**gentleman** 20:16
52:24 54:22 63:5
64:11 72:4 88:20
95:12 104:18
**geotechnical** 22:8
**germane** 29:21
72:17
**getting** 8:17 88:23
**give** 6:22,23 7:7
8:24 22:25 36:18
41:1,22 43:15 93:15
**given** 20:3 28:7
108:3,10
**glasso** 58:11
**glen** 2:3
**gloves** 84:9
**gmail.com** 2:4
**go** 7:2 10:9,15 11:9
13:8 30:3,13,14,19
36:8,9 40:6,7 41:20
44:7,15 47:22 49:7
50:25 57:21 64:9,12
65:16 66:17 80:5

97:11 98:20 101:3
101:17 102:1
104:22 109:1,24
111:3
**goes** 38:15 69:23
**goggles** 84:12
**going** 5:22 6:3,8
8:19 9:7 10:18,21
10:22,23 12:6,7
13:10 17:22 19:17
22:21,23,25 31:12
34:25 37:6,13,21
41:19 42:16 43:3
49:7,18 50:6,7,9
52:8 55:10 57:14
60:23 64:25 66:12
69:2 70:22 87:4,17
88:6 92:12,14,20
93:10 96:2,7 97:2,9
97:11 98:18 109:11
110:4
**good** 5:15 77:11
**goods** 27:6
**govern** 26:1
**governing** 26:12
**grabbed** 93:25 94:6
96:20
**grade** 74:2
**graduate** 21:25
23:22
**graduating** 32:24
**grass** 64:22 71:20,20
71:21
**grasses** 71:23
**gravity** 109:17
**ground** 6:2 70:25
71:4,4,7,13 72:1,6
72:14,23 73:23 75:2
76:25 77:3,6,9 84:5
86:13 94:13,16
105:14 110:18,20
**grounds** 96:9
**group** 25:19 35:9
**guess** 21:24 61:15

**guessing** 9:16
**gutter** 83:9

**h**

**h** 3:5
**half** 35:22,23
**hand** 79:14 83:19
98:21,22 112:21
**handrails** 62:19
**hands** 78:12 79:13
**handwriting** 17:9
17:10,12,25 103:7
**happen** 66:18
**happened** 61:23
80:5,8 83:7,15
85:15,16 93:25 94:5
94:9 95:16,21 97:23
99:1,5
**happens** 98:7
**hardware** 30:6
**hazard** 25:18,18
28:7
**hazardous** 109:7
**hazards** 19:25 24:22
49:9 108:12
**hear** 39:16
**heat** 22:11
**heating** 23:12
**height** 51:6
**heights** 79:2 85:25
**held** 1:11 8:7 19:19
25:3 48:14,25 60:20
103:25 108:20
**help** 36:3
**hereunto** 112:20
**hey** 61:19
**high** 84:5 91:1
**hill** 2:3
**hired** 33:9,11
**history** 32:21,24
**hit** 8:20,22 59:19
**hitting** 86:14
**hold** 27:14 45:11
**holding** 48:3 78:11
79:9 83:19

**holiday** 60:3
**home** 19:11
**homes** 58:9
**honest** 62:5
**honors** 23:20
**horizontal** 104:14
110:13
**hour** 10:2,11
**hours** 10:12
**house** 15:6
**household** 27:5,8,20
51:10
**huddleston** 62:12
**hughes** 1:11 3:2,15
3:17,22 5:8,15 7:13
7:15,19 8:10 9:7
12:3,7,7 21:4 30:25
31:13 34:18 35:16
37:21,24,25 38:4,7
38:14,18,22 40:12
40:15 41:2,6,6,11
41:25 42:4,6 43:3
49:8,22 50:4,8,11
50:14 53:2,20 54:7
54:11 57:12,14,17
57:21 60:24 67:7
77:14 90:12 102:8
102:21 103:4 107:5
108:10,23 111:6
112:8
**hundred** 35:3
**hundreds** 21:21
**hurt** 8:17 61:19

**i**

**ice** 8:21
**idea** 83:13
**identification** 9:12
12:13 31:18 38:4,7
49:14 50:17 57:17
69:3
**identified** 5:20
11:15
**identify** 36:16 54:6
56:17

**immediately** 78:6
79:18 81:3,15 82:3
86:14 95:21 96:20
**impact** 59:24
**impart** 85:4
**impediments** 71:6,8
**implied** 74:12
**important** 72:21
80:10,15 85:7,13,22
86:4,11,15 91:24
98:3
**imposing** 92:15
**improper** 109:7
**inch** 99:6,21 104:13
**inches** 99:7,21
**incident** 5:19 10:15
12:1 54:8 56:13
67:25 68:9,14 71:24
73:11,16 78:7 79:18
81:4,9,15,21 82:3
83:12,15,22 84:7,10
84:22 85:3,16 86:6
86:15 87:24 88:18
88:25 89:13,25 90:3
90:7,20 91:5,12,17
92:25 93:8 94:10
95:17 96:1 97:17
98:6,10 99:1 100:23
107:18
**incidental** 46:1
**include** 8:16 57:11
**included** 57:12
104:3
**includes** 12:18
49:19
**index** 4:1
**indicate** 79:20 80:18
**indicated** 66:15 72:9
93:11
**indicates** 32:10
69:18 86:23
**indication** 80:19
86:18 98:15 100:18
**indications** 82:13

**induce** 104:14
**industrial** 22:16
23:23 51:9
**industry** 23:15,15
26:9 107:7,8,9
**information** 3:20
25:18 28:7 50:17
55:4,12 63:18 65:5
65:6 67:11 80:23
83:5 84:2 85:2
**infrastructure** 8:13
8:14 21:8 22:7
**inherent** 98:9
**initial** 48:11 50:12
66:14
**initially** 14:20 55:3
62:20,25 66:25
109:12
**injured** 60:9 61:18
63:7 82:21 87:13
106:6
**injury** 58:12 59:5
60:2,3 62:16,17
86:25
**inn** 60:3
**inspected** 105:23
**inspection** 105:22
**inspections** 17:5
21:20,22
**instability** 79:21
80:24 94:24 95:1,6
98:15 100:9,18,23
**installed** 71:1
**instances** 39:4
**institute** 25:19 26:9
106:23
**instruction** 87:6
**instructions** 6:4
73:1 86:24
**insurance** 8:18 10:8
11:9 21:22 34:9,10
**intend** 83:3 92:1
**intended** 109:25
**intending** 81:2 84:6

**interest** 7:19
**interested** 59:23
65:2 85:9
**interesting** 93:15
**interior** 70:23
**interview** 65:22,23
**interviews** 65:21
**introductory** 52:23
**investigate** 61:15
**investigation** 3:11
12:13 26:2 62:22
63:21 64:5 69:14
102:15,16 103:1
105:11
**investigations** 34:11
109:3
**invoice** 13:22 14:6
**involve** 44:20,23
45:1 57:25 58:3,6,9
58:20 59:4,10,15
60:7 109:3
**involved** 43:5 45:21
47:15 55:15 56:13
56:21 58:12 59:16
61:9
**involves** 43:25
**involving** 38:19
45:24 58:13
**issuance** 17:2,15
**issue** 10:14 19:14
29:9 32:16 39:24
40:1,7 45:25 46:3,4
59:8 69:20 74:1
111:1
**issues** 22:8 25:21,21
32:15 37:10 62:19
69:25
**item** 26:6
**items** 9:18 110:2

**j**

**j** 2:2,2,7 58:5
**jacques** 58:5
**jean** 1:5 5:18

**job** 6:9 33:25
**journals** 28:24 29:2
**js** 1:5
**judge** 39:14 97:9
**judges** 20:11 39:20
**july** 1:9 37:25
112:21
**jumped** 99:15,16
**jumping** 64:15
**jury** 97:11

**k**

**k** 59:14,14
**keep** 22:22 54:23
77:21,25 78:3 87:7
92:8 94:15 109:11
**kemper** 34:13
**key** 72:7
**kick** 100:4,7
**kicked** 63:6 64:20
64:21 66:16,17
95:15 97:18 98:1,11
100:10,13 101:11
**killed** 8:17
**kind** 79:12 99:16
108:23,25 110:6
**knew** 77:25 78:3
**know** 6:21 7:2 9:25
10:13 15:13 16:5
17:1,4 20:19 21:21
21:24 32:16 34:20
37:2,7 39:3,20 41:7
41:20 43:12,19
44:23 47:17 48:3,4
48:4,6 51:7,8,10,13
53:22 54:22,24 55:6
57:2,5,7 58:18,19
58:23 61:9,17 63:3
64:12,16,17,21
65:23 66:21 68:13
69:24 72:6,12 73:8
73:9,12,14,20 74:2
74:6,9,11,16 75:1,5
76:7,12,14 77:21
79:1,19 81:10,11

82:1,5 83:16,20
84:5,11,13 85:8,15
85:22 86:5 87:21,22
88:1,4,8,11,14,20,22
89:11 91:3,4,10,14
91:19 93:6,9 94:9
94:12 95:20,25
96:19 98:2 101:19
105:8,16 106:21
107:13 108:2 110:9
110:17
**knowledge** 26:16,20
52:11
**knows** 74:11
**kukurin** 59:14 61:3
**kunsch** 2:7 3:3 5:14
5:16 8:9 9:17 12:17
16:19,22 19:21
24:25 25:5 30:24
31:22 38:11 42:25
48:18 49:1,17 50:21
57:20 60:18,22 96:3
96:7,11,15,18,24
97:8,16 102:1,6
103:23 104:2
108:22 111:5,8

**l**

**l** 58:8 59:3,9,12
**label** 69:4 70:1
84:18 87:10
**labels** 68:24 86:23
87:6
**ladder** 1:7 5:17 15:6
18:12 19:14 26:7,8
27:11 43:3,5,22,25
44:2,5,9,10,14,17
45:21,25 46:1,3,3,6
46:9,9,12,15,16,18
46:19 47:7,8,14,25
48:2 50:1 51:7,10
53:14 54:9,19 56:5
56:8,9,13 63:5,6
64:12,14,15,19,20
65:8 66:5,17,21,22

67:4,8 68:4,8,12,13
68:17,22,25 69:4,10
69:18 70:3,19,25
71:10,23 72:5,10,22
72:23 73:1,3,11,22
74:4,6,19 75:3,3,6,8
75:12,14 76:3,9,17
76:19,20,21 78:6,9
79:10,13,14,17,20
79:24 80:7,16,25
81:3,18,21,24 82:6
82:7,9,10,21,22
83:2,6,8 84:7,22,23
85:5,18 86:1,5,7,9
86:10,14,19,23,24
87:6 88:17,25 89:11
89:14,23 91:2,23,25
92:6,8,18 93:23
94:2,3,7,10,24 95:2
95:13,17 97:18,24
97:25 98:11,14,16
98:22,23,24 99:1,1
99:5,6,8,11,18,18,20
99:20 100:1,7,10,13
100:16,19,23 101:3
101:7,16,24 105:1
105:15 106:3,23
108:13 109:14,14
109:16,22 110:20
**ladder's** 64:14
**ladders** 3:18 26:8,11
27:23 29:3,8,13,24
30:5,6,7,8 31:9
38:19,20 43:13
44:21,24 45:1,24
46:23 47:1,9,16,16
47:19 48:17 49:13
74:9,13 76:22 82:17
105:9 106:7 109:1,3
109:11,25 110:5,7
**lafayette** 2:3
**land** 94:15
**landed** 88:21,21
101:5

**large** 104:9
**latest** 42:8,9
**laura** 1:12 112:3,12
112:23
**law** 2:2
**lawn** 101:8
**lawsuit** 5:17 57:3,5
**lawyers** 20:11
**layman** 26:17
**lead** 32:19
**leaned** 90:16
**leaning** 64:17 65:4,6
65:12 72:7 77:23
78:2 80:18 81:17,23
84:24 86:1 90:16
**leave** 97:7
**left** 6:8 64:12 95:13
95:17 98:11,14 99:6
99:18,19,21 100:2
100:10,16 101:17
101:24 103:10
**leg** 86:10
**legal** 97:3
**legitimate** 51:3
**legs** 66:22,22 72:5
78:10
**length** 91:10 92:20
**letter** 13:16,19
14:15 54:25
**letters** 55:2
**level** 23:23 70:21
72:2,15
**liability** 38:18 43:5
**licensed** 23:25
**limb** 81:25 83:11
84:6
**limbs** 63:6 81:5,6,8
81:12 83:10
**line** 4:2,5,7,9 88:1,2
92:13,18 93:11
98:20 99:4,14
104:25
**list** 9:18,20 11:14
24:8,17 25:7 28:12
38:14 39:4,9 40:11

40:12,15,25 57:10
62:6
**listed** 24:6 38:18
73:6
**listing** 27:17
**lists** 37:8 41:2
**litigated** 36:7,17
45:9,14 55:16
**litigation** 17:5 21:23
21:23 34:24 61:21
**little** 5:23,24 6:10
22:18 61:22 71:21
94:2 102:12
**live** 5:24
**llg** 15:23,24
**location** 7:12 10:24
104:15
**locations** 30:4
**locked** 76:11
**locks** 76:11,13
**log** 3:17 9:24 11:12
11:23,24,25 38:6,21
40:24 57:11
**logic** 91:7
**logs** 37:22
**long** 30:17 37:4
**look** 8:25 9:22 10:9
11:10 12:8 13:8
18:5 19:14 24:23
30:3,6,13,14,16
36:8,9,10 40:2 44:7
44:15 47:23 84:18
106:3
**looked** 29:23 30:4
41:12 49:3 53:14
66:9,9,10
**looking** 8:19 35:1
88:16 107:9 110:4
**looks** 19:6,7
**losco** 58:19
**lot** 8:18 23:9,14,16
33:18 41:19 61:13
61:19 106:24
**louisville** 1:7 5:17
44:21 47:13,24 50:1

54:19 56:5,8 105:9

**lowe's**  30:5 31:5,10
66:1,13 110:4

**lowering**  81:18,22
81:24 83:23 84:25
90:8

**lycoming**  112:1

**m**

**m**  1:4 59:9 112:3,12
112:23

**maccollum**  19:24
20:15,16

**magazines**  29:1

**maintain**  39:9 45:3
45:6

**making**  25:14 82:21
97:5

**malfunction**  56:17

**mall**  58:15

**manner**  100:24

**manual**  84:14

**manufacture**  27:5
29:13 47:1

**manufacturer**  27:19
27:22 35:24 36:7,16
43:3,22 44:3 51:7

**manufacturers**
26:10 29:24 36:1
110:5

**march**  12:9 13:22
50:24 52:19 53:1,5
105:4

**marie**  1:12

**mark**  12:7 13:11
17:22 31:12,13 49:7
49:18 50:7 57:14
92:19

**marked**  3:7 4:9 9:7
9:12,15 12:13 15:23
16:6 18:25 21:4
31:18 37:24,25 38:4
38:7 49:13 50:11,17
57:17 60:24 66:1
67:7 69:3 87:5,18

**87:18 88:6 102:8,20**

**market**  1:24 2:8
37:12,14

**marketing**  33:18,23

**marshman**  1:5 5:18

**martin**  58:15

**master's**  24:10,13
24:14

**materials**  54:6
110:1

**matter**  13:5 20:21
36:7,17 43:5 48:9
57:25 58:2,19 59:25
61:6 62:21 67:14
72:3 102:16

**matters**  38:17,19,22
45:9,14 55:16

**mean**  39:12 41:16
44:17 64:19 65:5,7
70:12 72:7 80:2
105:2 106:24
110:21

**meaning**  63:24 64:2

**means**  9:25 63:25

**meant**  66:19

**measurements**
65:17

**mechanical**  22:10
22:11,12,16,18 23:4
23:6,7,11,13,23
31:15

**mechanics**  23:9

**mechanism**  18:11
18:21 45:21 107:20

**medication**  7:5

**meet**  9:2 69:18

**meets**  69:7,10

**member**  31:14,23
32:1,4 36:20

**mention**  69:1 72:20
82:12

**mentioned**  34:8
67:8 69:21 72:16,17
80:9

**met**  9:4

**methodology**  48:8
49:3

**michael**  2:7 5:16

**michael.kunsch**  2:9

**mid**  43:14

**midair**  99:17

**middle**  1:2

**mike**  15:21 57:7

**mileage**  10:10

**mind**  64:4 108:15

**mine**  106:9

**minute**  57:22

**minutes**  30:18 100:6
100:8,22

**missed**  104:4

**missing**  21:9 104:5

**misuse**  56:24

**model**  56:13

**moment**  85:9,13,16
90:7

**moments**  80:3

**month**  34:22,22
35:11 62:17

**months**  35:8 40:22
78:18,18

**morning**  5:15 34:9
38:22

**motion**  97:10

**move**  80:7 86:10
97:4,19,25 100:10

**moved**  80:16 95:17
98:14 100:16

**movement**  79:17,20
79:24 96:5

**movements**  90:6

**moving**  83:21 98:5
98:11,25

**mud**  64:23

**n**

**n**  1:11 2:1 3:1 58:25
59:9,14 60:6

**name**  5:15 11:16
34:14 36:19 55:7

**met**  9:4

**names**  60:25 61:1

**narrows**  64:3

**national**  34:14

**nature**  59:21

**near**  88:21,22

**necessarily**  10:22
56:21

**necessary**  65:1
67:11

**need**  6:11 7:1 21:1
41:7 56:16 68:16

**negligence**  109:4

**neoprene**  76:22 77:5

**never**  11:22 39:23
39:23,25 53:11,14
72:12,16,17,20 80:9
88:9 109:17

**new**  11:3 68:18

**nine**  9:18 105:13

**non**  106:19

**norfolk**  61:11,13
62:9

**north**  7:10

**notary**  1:13 112:3
112:13,24

**note**  82:10 96:22

**notes**  3:20 17:24
18:4,6,10 49:19
50:13,16 51:14,16
52:2,3,20 53:1 63:9
68:15,17 81:16
112:18

**notice**  1:11 3:9 9:8,9
9:11 14:19 15:2
49:5

**number**  3:7 9:13
11:16 12:14 24:5,24
31:19 38:5,8 49:14
50:18 55:15 57:18
89:3 107:17

**o**

**o**  58:8 59:3,25

**o'donnell**  58:25

**oath** 64:6
**oaths** 112:4
**object** 96:2,3
**objection** 96:4,8,9
   96:10,11,12,22 97:4
**objections** 5:4 96:25
**obtained** 49:19
**obviously** 40:7
   48:10 62:13 72:12
   76:5
**occurred** 5:19 83:22
   85:10 94:10 95:17
   96:1 97:17
**occurring** 73:11
   78:7
**offered** 94:22
**offering** 29:16
**office** 8:14 11:13
   14:13 30:15 49:23
   54:21
**offices** 2:2 7:13
**oh** 24:25 46:3 61:3
   62:3 78:5 104:18
   108:9
**ohio** 34:12 43:8
   46:19,20
**okay** 6:2,24 7:9,22
   9:1,6,6,23 11:1,12
   11:22 12:2 13:7,11
   13:12,19 14:6 16:21
   17:12,14,18,23
   20:24 21:12,16
   22:20,24 23:19 24:5
   28:19 31:12 33:1
   34:8 35:6,12,23
   36:15 37:21 38:12
   38:17,21 39:18 40:2
   40:3,10 41:25 42:3
   42:13,20 43:18,21
   44:5,20 45:20 52:1
   52:13,25 53:8 58:8
   61:5,11 62:8,15,20
   63:9 68:17 72:21
   74:14 78:11 80:14
   82:5 85:1 87:10,22

88:3 89:2 90:6
   91:23 96:3 99:4
   102:11 103:17
   104:3,17,21 105:4
   105:11 106:5,18,21
   107:2,11 110:25
**old** 60:16 68:18
**older** 33:17
**once** 52:16
**one's** 109:16
**ones** 36:5,23 41:21
   110:10
**operation** 85:2
   91:24
**operator** 109:4
**operators** 82:18,20
**opine** 46:5
**opinion** 63:22 70:2
   71:22 89:22 94:20
   94:22 97:11 98:10
   101:10 107:24
**opinions** 13:2,5 26:2
   28:21 29:16,22 48:9
   64:7 72:18 84:3
   85:7 86:8,11,16
   90:11 98:3
**opposed** 34:17
**oral** 1:11 14:19
   63:14
**order** 16:10,14,15
   93:15
**ordinary** 45:12
**organization** 25:12
**orientated** 104:12
**original** 103:21
**originally** 107:21
**osha** 26:10 66:8
   74:10 106:10,10,18
   106:21
**ought** 39:18 40:2
**outcome** 62:22
**outside** 109:17
**overlap** 61:2 106:24
**overlapped** 82:6

**overlaps** 22:14
**overreach** 87:7
**overreaching**
   109:15
**oversized** 104:9
**owned** 51:9
**owner** 7:21

**p**

**p** 2:1,1
**p.e.** 3:15,17,22
**p.m.** 111:11
**pa** 1:12,25 2:3,8
**package** 49:18
   102:20
**pads** 77:11
**page** 3:7,9,11,15,16
   3:21 4:2,5,7,9 16:23
   18:2 19:2 24:23
   31:13,13 32:20 38:3
   38:6 48:21 49:8
   51:16,16 52:2,2
   53:1 57:22 60:10,12
   90:12 92:13,21
   93:11 98:18,20 99:4
   99:14 102:12,14
   103:4,16 104:4,22
   105:11 107:2
   109:24
**pages** 3:13,18,20
   17:24 18:10 19:1
   49:12 50:16 57:16
   107:23 108:24
**painting** 83:9
**paper** 31:1 51:21,22
**paperclipped** 17:18
**paragraph** 102:15
   105:12,21 109:25
**paraphrasing** 96:13
**part** 27:1 52:24 53:2
   69:14 72:23 75:8
   93:22,23 94:10 96:1
   97:17 101:10
   102:20

**participate** 28:23
**participated** 21:19
**parties** 5:2 41:15
   60:11
**parts** 22:12
**patents** 27:14
**paul** 34:13
**pay** 17:6,17
**pc** 57:17
**pe** 5:8 38:7 112:8
**peer** 28:23
**penn** 21:25 23:21
   32:24 34:14
**pennsylvania** 1:2,13
   7:11 24:1 46:20
   112:2,5
**people** 8:17 23:14
   30:4 51:5 106:6
   110:1
**percent** 35:3,17,19
   35:20
**percentage** 34:16
   35:13
**perfect** 48:23
**perfectly** 71:5 72:12
   110:20,21
**performed** 56:7
   102:16
**performing** 85:3
**permit** 64:6
**permitted** 67:18
**person** 55:7,7 59:19
   59:24 96:13
**personal** 58:12 59:5
**phil** 96:8,25 97:8
**philadelphia** 1:25
   2:8 11:4 58:22
**philip** 2:2,2
**philjberg** 2:4
**phone** 9:5,6 63:4
   65:23 102:17
**photocopies** 31:17
   105:23 107:4
**photocopy** 3:13

**photographs** 3:13
  15:5 19:7 31:2,9,12
  31:18 49:24 54:10
  54:11,15,20 65:2
  73:24,25 77:13 88:9
  102:19
**photos** 54:7,8,9
  105:7
**physical** 107:3
**picture** 18:3,11,16
  19:1 30:12 51:18
  69:2 86:22 87:4,17
  87:19,21 88:6,19
**pictures** 15:9,20
  18:18 19:5,10,11
  30:10,11 31:1 53:21
  66:1 77:14,15,19
  78:16,17 87:20
  107:5
**pine** 72:10
**place** 16:10 51:5
  55:8
**placed** 71:23 76:15
  76:25,25 77:2
**placing** 102:7
**plaintiff** 5:21 43:23
**plaintiffs** 2:5
**platforms** 3:19
  48:17 49:13 108:13
**plays** 110:21
**please** 6:16 7:2 9:19
  50:25 62:3 102:11
  104:23 105:11
**plus** 26:10 107:12
**point** 93:10 94:2
  97:12,13
**pointing** 88:13
**points** 72:8
**policies** 45:10
**policy** 45:8,14
**pool** 58:14,15
**portable** 51:11
**position** 81:14
**positioned** 73:22

**possible** 63:24 91:25
**possibly** 10:22,22
  86:12,17,21
**potential** 63:2
**pounds** 73:17 91:16
  91:21 104:17
**preparation** 9:1
**prepare** 11:17 38:12
**prepared** 5:21 40:11
**present** 51:5
**president** 7:21
**pretty** 22:9 39:21
**prevent** 76:9
**preventative** 61:17
**prevented** 61:20
**previously** 43:1
  93:12 102:8
**primarily** 10:13
  20:18 23:24 33:12
  33:17
**primary** 109:20
**print** 40:6
**prior** 13:8 14:9 16:1
  16:16 17:2,15 30:2
  31:6 45:21 52:18
  66:2 67:24 68:8,21
  68:25 73:11 78:7
  79:18 81:3,8 82:3,9
  83:11 84:7,22 85:3
  85:19 86:5,15 90:6
  93:7 101:23
**proactive** 61:22
**probable** 64:2
**probably** 12:1 25:21
  32:13 35:10 42:16
**problem** 8:19,22,24
  35:1 64:1 67:1,3
  70:13 80:21 100:9
  109:16 110:22,22
**problems** 32:15,18
  68:22 80:1 109:8
**procedure** 39:8
  81:11
**proceeded** 98:22

**proceedings** 30:22
  42:23 102:4 111:11
  112:16
**produced** 11:25
  15:18 39:24 78:16
  78:20
**product** 29:2 33:6
  35:24 36:7,16 38:18
  43:5 56:8,15,17,20
  56:25 63:1 67:23
**production** 4:4
**products** 23:17 27:5
  27:9,16,20 56:5
**professional** 24:1
  32:8 39:20
**program** 23:20
**projects** 8:13,15
  21:6,8,10,13 22:7
  35:9
**promise** 23:1
**promulgated** 106:22
**promulgates** 26:5
**properly** 82:25
**property** 3:15,22
  38:4 57:17
**protective** 16:10
**provide** 11:14,22,24
  70:20
**provided** 11:13
  15:11 16:1,4,9,25
  19:12 30:25 54:15
**provides** 70:23
**providing** 29:22
**provisions** 76:8
**pruned** 81:8
**pruner** 83:17 84:15
  84:19
**pruning** 63:5 78:13
  78:14,23 81:5,6,12
  84:17 96:21
**public** 1:13 112:4,13
  112:24
**publication** 24:21
  28:20 107:14
  108:11

**publications** 24:17
  25:6 28:15
**published** 20:13
  28:19
**publishing** 20:10,11
**pull** 41:21 48:2
**pulled** 49:5 94:1
**purchase** 20:7,9
  30:8
**purports** 18:21
**purpose** 68:13 70:15
  70:16 92:10 104:6
**purposes** 9:12 12:14
  31:18 38:5,7 49:14
  50:17 57:18
**pursuant** 1:11
**put** 19:22 30:11
  31:14 45:17 50:6
  70:18,19,22 75:2,3
  104:14

**q**

**qualified** 46:22,25
**qualify** 47:3
**question** 5:5,25 6:12
  6:16,21 14:2 15:6
  20:20 23:4 32:11
  35:12 43:4 44:8
  45:13 55:11,11 67:2
  74:8 77:24 79:23
  80:11 88:19,23
  90:18 91:18 96:16
  97:14 100:8,21
  101:15 106:18
**questions** 4:9 6:4
  7:7 22:21,22,23
  23:1 51:4,12 55:5,6
  55:9 63:8 64:23,24
  64:25 73:6 86:2
  97:3 106:15 111:5,7
  112:11
**quickly** 42:15
**quoting** 11:1

**r**

**r** 2:1 59:3,12,14
**rail** 46:8,10 75:17
  76:20
**rails** 46:8 75:12,20
  75:22 77:22 78:1,4
  87:8 92:9 109:17
**range** 35:21
**rate** 10:6
**ray** 61:25 62:5
**reach** 48:8 92:1,21
  92:22 93:3,4
**read** 68:24 69:12,15
  84:14 86:24 96:13
  97:6,22 101:23
  107:22,23 108:5,6
  109:18
**reading** 5:3 99:13
**reason** 7:2,6 21:10
  66:12
**reasonable** 110:25
**recall** 9:15 17:4
  27:24 43:11 44:4,22
  44:25 46:7,18,21
  47:5 55:23 58:16,21
  59:13 62:7,13 63:16
  63:20 68:10,11
**receive** 53:17 63:18
**received** 5:21 27:17
  37:22,24 38:21
  53:23 54:18 78:17
**recess** 30:21 42:22
  102:3
**reckless** 106:7
**recollection** 15:1
**record** 7:3 8:7 14:3
  15:20 17:22 19:19
  20:22 25:1,3 41:7
  48:14,25 49:22 57:9
  60:18,20 102:1
  103:23,25 104:3
  108:10,20,23
**records** 13:25 14:3
  16:4,6

**redo** 21:17
**reduced** 112:14
**refer** 68:15,16 81:16
**referenced** 19:25
**references** 12:19
**referred** 54:12
  110:10
**refresh** 15:1
**regarding** 20:21
  29:12
**regardless** 110:19
**registered** 23:25
**regulations** 26:11
  66:11 106:11
**reiterate** 53:11
**related** 34:3
**relatively** 72:11
  89:24
**released** 94:3
**relevant** 10:17
  28:21 29:15 55:4
  66:6
**reliability** 29:12
**reliable** 63:22
**relied** 84:2 90:10
**rely** 71:22
**relying** 73:24
**remained** 94:12
**remember** 17:14
  36:5 40:9 43:23
  46:13,14 60:1 61:10
**rendering** 26:2 84:3
  90:10
**rented** 51:8
**repeat** 39:16 91:18
  97:20
**rephrase** 6:17
**report** 5:21 12:10,22
  12:25 13:4,13 15:16
  15:18 16:2 17:3,16
  20:1 21:4 30:2 31:7
  50:2 52:18 53:25
  54:5,13,19 62:23
  63:15,19 66:3 67:7
  67:11 69:18,21

78:19 79:6 80:24
  102:8 104:9,21
  106:2
**reporter** 6:7 112:3
  112:13,15
**reporting** 1:24
**reports** 45:3
**representing** 2:5,10
**represents** 5:16 88:4
  88:8,11,14
**request** 4:4 41:17
  63:17
**requested** 12:3
**require** 16:15 40:23
  93:16
**requirements** 16:14
**research** 29:15,21
**reserved** 5:6 111:13
**resistant** 109:14
**respect** 56:12
**respective** 5:2
**response** 80:12,12
  81:19 90:18
**responses** 6:11
**responsibilities**
  33:22,25
**rest** 101:20
**resting** 64:21 75:6
  89:14 109:13
**result** 86:14,25
  109:4,8
**results** 102:15
**retained** 35:24 36:6
  36:17 43:22 44:2
  47:10 55:3 60:11
  61:6 62:12 105:5
**retention** 45:8,10,13
**review** 9:19 14:23
  28:24 67:14 102:19
  102:23 107:7 111:3
**reviewed** 54:6
**revised** 54:9 105:8
**richard** 1:11 3:2 5:8
  112:8

**right** 6:5,7,15,20
  12:4,22 14:10,20
  20:3 23:2 30:15
  41:4,23 42:17 43:1
  43:25 48:19 51:4
  54:2 64:13 67:2
  69:8 70:18 75:15
  92:15,23 94:2 95:13
  95:18 98:12,14,21
  98:22 100:11
  101:17 102:9,18,22
  102:22,24 103:15
  103:19 110:11,11
  110:15
**righted** 94:3
**risk** 87:13
**rivets** 18:14
**roberts** 58:11
**role** 110:21
**room** 30:15
**root** 63:25 72:20
**roots** 72:14 89:3,12
**rubber** 77:11
**rule** 9:24 11:23
  39:19 40:2,24 64:17
  65:4,10 95:2,6
  100:22
**rules** 6:2 39:7 40:23
**rung** 76:11,13,20
  82:2 83:25 90:23
  91:4,8 98:23,23
**rungs** 75:10,11,19
  75:25 82:6

**s**

**s** 2:1 3:5 58:5,25
  59:3,25,25 60:6,6
**safe** 70:7,8
**safety** 25:21 28:8
  37:10,10 47:8
**sale** 31:10
**sat** 25:14,21
**satisfied** 64:4 67:10
**saw** 78:13,14

**says**  17:13 18:14 19:2 60:10,12 64:19 69:7 87:6 92:8 99:14 103:10,13 105:4 107:2,17 109:9
**scaffold**  27:11 51:7
**scaffolding**  3:18 48:17 49:13
**scaffoldings**  108:13
**scene**  10:15 53:12 64:9 65:17
**schedule**  10:1
**scheduled**  14:20
**school**  32:14 57:23
**science**  22:4,14 23:19,20 110:9
**sciences**  31:24
**scientific**  26:16,20
**scrap**  51:20,21,22
**scribbling**  49:6
**se**  61:14
**sealing**  5:3
**seated**  6:7
**second**  19:2 32:13 42:19 52:2 53:4 61:6 79:12 102:14 104:22,25 105:12 109:24
**section**  12:18 74:22 74:22,25 75:4 76:6
**sections**  74:19 75:14
**secured**  76:11
**see**  16:7 24:21 51:3 61:3 62:3 78:14 93:16 96:6 103:21 108:6,8
**seeing**  16:16
**seen**  9:9 15:2 87:19 87:20,21 88:9
**segueing**  106:18
**self**  87:15
**sell**  30:5
**send**  39:18 96:17

**sent**  54:22 55:13
**sentence**  105:7,13 109:2
**september**  112:25
**seriously**  39:16
**services**  36:21 37:12
**set**  15:5,20,22,23 25:20 72:5 73:3 74:4,7,13 82:5 88:17,25 91:24 95:24
**setting**  72:23 82:25 106:13
**setup**  79:21 80:21 109:7
**seven**  45:11
**sewer**  22:7
**shears**  78:24
**shecktor**  1:4 3:11 5:18 12:12 15:23,24 18:24 19:1 52:13 53:5,9 55:21 57:2 63:12 65:19,23 66:15,15 67:4 68:7 69:3 73:3,13 77:21 78:23 81:2 82:9 83:6 84:9,21 85:3 85:19 86:19,22 87:5 87:18,19,23 88:7,17 88:24 90:2,15,19 93:6 94:4 97:19 99:19 100:15,24 101:2 105:14,19 107:17,25
**shecktor's**  15:5 19:6 53:17,22 81:14 92:12 97:21,22 98:19 99:8 111:2
**sheehan**  2:7
**sheers**  96:21
**sheet**  48:12,21 49:3 49:8 50:11,13 103:19
**sheets**  31:1

**shifted**  99:20
**shockey**  33:1,8
**shoe**  19:2 54:9 76:21 104:11 105:8,9 110:19
**shoes**  69:20 73:18 105:22,24 109:13
**show**  9:7 12:6 16:15 37:21 69:2 87:4,17 88:6 92:12 98:18 110:11
**showed**  14:24 107:22
**shown**  19:22
**shows**  21:6 87:22
**side**  51:17 75:12,12 75:17 77:22 78:1,4 84:23,23 87:7 92:9 99:6 103:11
**sides**  89:6
**sideways**  66:18 76:9
**sign**  16:13
**signature**  111:13
**signing**  5:3
**similar**  41:1 62:10
**simple**  55:12
**single**  36:16
**sir**  7:7,9,12 9:8,9 12:8,9,22,24 13:7 15:22 20:24 21:2 22:5 39:23 57:21 60:23 68:16 70:2 87:6 88:16 92:12,14 92:25 93:11 98:18 98:20 99:9 100:7,22 101:11 102:7,11 108:12
**sit**  21:17 36:4,15 42:10 69:22 70:3
**site**  107:3
**sitting**  46:8,18 47:16 47:17 48:5 67:6 72:19
**situation**  29:17 106:19

**six**  43:13,15 44:5,9 44:13,13,17 45:24
**slide**  76:9
**slightly**  94:1
**slip**  58:17 109:12,14
**slope**  73:23
**slot**  70:14 110:21,23 111:2
**slots**  66:24
**smallest**  11:7
**snow**  8:22
**society**  31:15
**soft**  70:19
**soil**  71:17 72:11
**soils**  70:20 71:14,23 76:23
**somebody**  60:8 67:15
**someplace**  46:19
**somewhat**  107:20
**sorry**  24:25 109:2
**sort**  18:3 22:14 74:14 93:17
**sound**  13:11
**sources**  29:2
**southern**  61:12,13 62:9
**space**  23:14
**speak**  28:3 52:13
**speaking**  28:12 65:19 96:24
**special**  26:16
**specific**  29:18 45:2 76:16 78:8
**specifics**  69:23
**spectrum**  22:9
**speculating**  88:15
**speculation**  94:17 94:18
**speed**  59:24
**spent**  14:4 35:4
**spiked**  77:8
**spoke**  52:25 53:5,8 78:22

spoken  56:4
ss  112:1
st  34:13
stability  82:14
stabilized  96:5
    97:24
stable  109:15
stack  17:18 49:25
staircase  62:18,18
stand  92:14
standard  66:6
standards  25:11,14
    26:1,5,12 106:22
    107:7,8,9
standing  81:17,18
    81:21,24 83:21,23
    84:25 85:19 90:8
    105:2
start  32:12 97:1
    99:15
started  63:8 98:19
    98:24 99:8
starting  57:22
starts  105:21
state  11:5 20:17
    21:25 23:21 32:24
    34:12 43:10 97:3
stated  105:13,14
statement  13:1,5
    32:23 100:5 101:1
    106:8
statements  97:5
    111:4
states  1:1 24:5 43:14
static  83:25
station  18:3
steel  32:17
stenographically
    112:12
step  82:2 99:5
stepladder  46:14
stepladders  46:17
stepped  51:10
stick  22:22

stiff  82:11
stipulated  5:1 26:11
stipulations  4:7
stop  22:24 76:8
store  30:5
stored  45:17
stores  30:6
storm  8:21
story  93:14
straight  93:17
    101:10,12
strictly  41:22
strike  32:11 85:18
    93:23,24 100:7
strobel  59:3
struck  86:5,7,9
structural  26:24
    27:1,2 28:3 32:15
    32:16,17 33:9,11,12
    33:13,15 34:2 37:9
structures  8:20
    22:12 24:15 34:6
    35:1
studied  29:17
study  23:9
stuff  23:16 54:23
subject  32:7
subjects  24:12
submitted  102:20
subscribe  29:1
subscribed  112:21
sufficiently  64:5
suite  1:24 2:3
summary  102:14
supplied  54:7 55:25
    73:25
support  4:1
supposed  78:3
sure  17:21 41:7
    51:25 55:24 56:11
    61:5 92:16 103:22
    108:9

surface  66:20 70:20
    70:21,25 71:4,4,7
    71:11,13 72:2,23
    73:22 76:18 77:6
    89:9,9,24 109:12,15
    110:18
surfaces  70:21,22,23
surprise  91:14,19,22
    101:22
surprised  39:19
surveying  22:8
sweeney  2:7
sweeneyfirm.com
    2:9
swivel  70:14,15,16
    70:17
sworn  5:9 100:15
    101:1 112:10
systems  22:11 23:12
    23:13

<hr>

**t**

t  1:11 3:2,5 5:8 59:3
    59:9 60:6 112:8
take  5:22 6:8 7:1,3
    8:25 12:8 15:9
    16:19 18:5,18 21:17
    22:16 23:7,8,22
    30:10,17 31:4 40:8
    41:19 42:18,19 52:7
    65:17 112:5
taken  1:11 15:13,15
    15:21 19:11 30:12
    31:5,6 50:10 54:8
    55:18,19 74:14
    112:11,18
talk  5:23 15:4 38:14
    40:3 66:2 82:16,17
    82:17 103:3 106:10
    108:25
talked  62:1,4 63:9
    65:25 97:21 105:21
talking  41:8 47:18
    49:2 54:10 97:1
    106:2 107:8

talks  28:7 48:16
    69:25 105:7
tall  73:13
tasa  36:24,25 37:5,8
    37:17,19
taught  27:25
technical  26:16
tell  6:16,23 9:20
    18:6 36:4 42:10
    43:8 48:5 50:9 51:1
    68:21 69:22 71:10
    88:16,24 93:3 94:4
    96:8 99:12 103:10
ten  12:1
testified  5:10 11:15
    11:19 38:25 39:5,10
    40:4 42:11 43:4,13
    44:6,10,14,18 47:13
    61:24 99:19 100:6,8
testify  58:22 61:14
    62:23 64:6
testifying  39:6 60:1
testimony  3:2,16
    5:23,24 7:7 9:24
    11:12,23 37:23 38:6
    38:20,21 40:13,16
    40:24 41:3,22 42:1
    43:2 57:11 59:21
    60:25 75:22 90:15
    95:5 97:8,22,22
    99:9 100:11,15
    101:23,24 108:4
    112:7,20
testing  26:2 68:4
tests  28:20 56:7,12
    110:6
thank  111:8
the2  57:16
theories  28:20
theses  24:13,14
thesis  24:10
thing  21:8 41:24
    42:8,9 48:10 61:21
    68:10 104:11
    107:23 108:7

**things** 9:20 22:13
23:11 36:4 39:6
57:11 64:18 72:1
87:12 95:1
**think** 7:18 17:20
18:8 23:13,14 39:12
39:13 45:18 47:23
60:2,10 62:8 65:1
67:8 69:20 85:15
94:20 97:14 107:20
**third** 68:18,19
105:12
**thirty** 35:17
**thorough** 63:21 64:5
**thought** 40:17,18
41:23 66:16,24
107:21
**thousands** 106:5
**thousandths** 104:13
**three** 10:12 23:24
78:18 105:15
**threshold** 59:6
**tie** 76:3,10
**tied** 76:6 109:14
**time** 5:6 6:5,15,20
7:1 13:25 14:3,4,22
21:17 35:3,14 40:1
41:19 42:17 51:5
53:8 55:7 68:11,12
68:18,19 71:24 73:3
73:4,15 78:14 80:7
81:20 84:9 87:23
88:17,25 89:12,24
90:3,20 91:4,11,16
92:25 93:20 97:12
97:13 98:6 107:18
**times** 11:25,25 12:1
34:8 40:4 42:10
43:13,15 44:13
52:15 54:23 61:19
68:7 73:10 90:14
109:11
**today** 6:9 7:7,9 9:2
9:15,16,21 13:3,9
14:7,13,24 21:2,8

21:17 22:22 36:15
37:24 39:1 42:10
55:19 67:6,15 70:2
108:5,18
**today's** 9:8
**told** 40:18,21 55:21
63:1 80:15 81:20
85:21 90:8,15,25
91:14,19 92:24
97:18
**tolerance** 104:13
**tool** 92:20,22 94:1,3
94:6 98:20
**tools** 110:1
**top** 72:9 76:4,9 82:8
89:20 93:19,20
105:2,2
**topics** 24:14
**tornado** 8:20
**town** 11:10
**training** 27:4 74:14
**transcript** 96:17
112:19
**transcripts** 56:1
**travelers** 34:13
**tree** 63:6 72:10 75:4
75:7,9,13,23 76:1,3
79:3,5 83:17 84:15
84:17,19 87:20,22
87:25 88:14 89:4,12
90:5 96:20 99:16
101:9 105:16
**trial** 5:6 39:10 40:4
40:12,16 41:3,25
112:6
**trip** 60:3,9
**true** 21:4 86:25 87:2
94:16 95:16,22,23
100:25 101:20
108:13 110:2
**truthful** 7:7 65:8
**try** 41:22 61:16,17
97:13
**trying** 60:1 61:21,22
61:22 99:17 106:17

**tuesday** 1:9
**turn** 20:24 32:20
102:11
**tuscarora** 34:14
**twelfth** 90:22,23
91:8
**twelve** 35:8
**twist** 93:21
**twisted** 93:18,21,24
93:25
**two** 10:12 17:24
22:3 24:11,12 31:1
37:22 39:6 40:19
62:1,2 63:10 65:24
74:19 75:10,11,14
75:19 78:10,10,18
79:13,13 99:7,21
102:17
**type** 8:14 34:24,25
48:20
**types** 73:18
**typewriting** 112:14
**typically** 10:10 56:1
56:3

**u**

**u** 58:5 59:14,14
**ul** 25:12 27:17
**underlined** 60:11
**underlines** 60:13
**understand** 6:2,13
6:16,17,18 7:3,6
8:23 11:16 39:11,14
39:14 40:10,11
62:21 72:21 98:25
**understanding** 73:5
74:5 78:13 80:4
89:22 90:4 100:12
100:14 101:8,16
**understood** 72:13
**understudy** 32:18
**unequivocally** 36:9
106:25
**uneven** 89:7

**uniform** 70:20,23
**unique** 26:15
**united** 1:1
**unstable** 72:20
80:19,20 82:21
86:20 92:6 94:7
**updated** 21:12
57:10
**upwards** 105:1
**use** 48:8 68:7,8 83:3
92:6 105:9 106:7
109:7 110:1
**user** 87:12 91:24
109:13

**v**

**v** 57:22 58:2,5,9,11
58:15,25 59:18,25
**van** 15:21 57:7
78:17
**varies** 34:20,21
**various** 30:4 32:14
34:9 49:23
**verbal** 6:11
**verbally** 79:8
**verified** 74:6
**veritext** 1:24
**version** 42:6
**vertical** 66:24
110:13
**violates** 70:3
**virginia** 11:4 33:4
61:25
**vitae** 12:19 20:25
21:3,5
**vititoe** 59:18
**vs** 1:6

**w**

**w** 59:12
**waived** 5:4
**walk** 13:10
**want** 6:22 12:8
14:23 18:5 22:21
23:1 39:8 42:19
45:2 47:23 48:22

55:10 67:16 70:18
70:18 92:5 93:15
97:1
**wanted**  40:17,18,19
**wants**  67:16
**warning**  68:24
84:14,18
**warnings**  72:25
**water**  22:7
**way**  22:21 49:7
69:12 70:3,6,10
90:2 92:2 101:13,16
**wayne**  34:14
**ways**  71:10
**we've**  20:21 35:8,9
52:1 60:24 62:1
63:9 65:25 73:21
104:3 110:10
**wearing**  73:18 84:9
84:12
**week**  34:20,20 40:19
**weeks**  40:20
**weigh**  64:16 73:15
83:17
**weighed**  73:17
91:15,20
**weight**  8:21 51:6
83:18 91:10 104:18
**weld**  32:17
**went**  31:10 41:12
51:2 53:11 57:9
65:25 66:18 94:2
98:22 101:24
**werner**  46:9
**west**  11:4 61:25
**whereof**  112:20
**white**  77:16 105:23
107:4
**wilson**  62:4
**winchester**  33:4
**wind**  8:21
**windows**  83:9
**witmer**  33:19
**witness**  4:2 5:20
36:20 48:16 96:8,15

97:1,2,7,10 99:13
112:10
**witnesses**  39:21
**wobbly**  82:11
**wood**  24:15,16
46:11 47:21 51:11
**word**  106:25,25
**wording**  63:3
**words**  10:10 23:22
45:16 96:6 103:11
103:11
**work**  8:16,18 10:8
17:4 33:16 34:16,18
34:24,25 35:9,15,15
43:24 61:13 92:1
**worked**  25:11 27:19
27:22 34:9 56:9
60:16
**working**  32:14 46:2
87:23 93:7
**workplace**  106:13
106:19
**works**  56:4
**worse**  104:20
**would've**  64:23
**write**  19:3 24:10
62:3,22
**writing**  66:2
**written**  24:19 28:17
51:18 103:11
**wrong**  40:21 96:13
**wrote**  15:15 17:14
19:23 53:25 54:19
63:15,18 78:19
80:23 109:5

| x |
|---|
| **x**  3:1,5 88:7 |

| y |
|---|

**y**  58:25 59:12
**yarbough**  57:22
**yard**  72:12
**yeah**  10:23 14:8
40:17 49:7 51:20
53:7 55:14 56:3

61:8 62:1 65:15
78:20 80:11 97:21
103:2 104:9
**year**  21:24 32:13
34:21,21,21,21,23
34:24 35:1,7,13,18
37:16 68:18 106:6
**years**  5:19 7:18 8:12
8:15 25:22 36:2,11
37:6 41:2,10 45:11
48:6
**yep**  99:11
**yesterday**  11:14
**york**  11:3

**EXHIBIT "C"**

### *Richard T. Hughes, P.E.*

*Consulting Engineer*
*107 N. Front Street*
*Clearfield, PA 16830*
*V (814) 765-8691*
*F (814) 765-8692*

July 20, 2011

Mr. Philip Berg
Attorney at Law
Andorra Glen Court Suite 12
Lafayette Hill, PA 19444

RE:  Shecktor v. Louisville Ladder

Dear Mr. Berg:
    During my deposition on July 12, 2011 the defense counsel, Mr. Michael Kunch asked specific questions with regards as how the ladder fell off the tree. Mr. Kunch quoted from Mr. Shecktor's sworn testimony that the ladder fell sideways to the left and then struck the ground. Kunch asked me if this would alter or change my opinions based on this information. My opinions were based on the base of the ladder moving initially outward. While Mr. Kunch quoted from Shecktor's deposition he never mentioned Shecktor's statement which followed the side sway testimony.
    On page 86 of Shecktor's deposition he describes the initial movement of the ladder before his fall; "As I made my first step down, the ladder, the left side of the ladder dropped about an inch maybe two inches and destabilized me". On page 89 Mr. Shecktor stated "It fell kind of backwards to where the feet were". This is consistent with my opinion of the flawed slot design causing the problem wherein it can cause horizontal loads. This is important because this indicates that the base of the ladder slid backwards first then it fell off the tree. The drop of an inch or two as Shecktor describes would be the downward movement available in the cleat shoe due to the 1-1/2 inch vertical slot as shown in Louisville Ladder shop drawing F-1825 as drawn in the year 2002 (See attached).
    While ascending or descending the ladder there will always be times when only one foot of the user is in contact with the ladder which would induce a greater load into one rail. This force was considered in the attached stability calculations. The calculations attached herewith as described and illustrated during my deposition reveal that the 5/16th diameter bolt in the cleat which is only .0225 of an inch smaller than the vertical slot (.335 in) which can induce a horizontal force not expected in the base of the ladder if the cleat is not perfectly resting on a level surface. This vertical slot provided is unlike other manufacturers who eliminate this potential problem by curving the slot and using an undersized bolt which does not bind in the slot. Louisville Ladder has since eliminated this vertical slot on newer models. (See attached photos). The cleat shoes should not be used when bearing on soil or a sloped surface.
    Based on a review of the shop drawings and Shecktor's sworn testimony my original opinions remained unchanged; the cleat design is flawed and caused instability in the ladder.

Sincerely,

Richard T. Hughes, P.E
Attachments

# Hughes Engineering P.C.
## Consulting Engineers
107 N. Front St. Clearfield, PA 16830
814-765-8691      Fax 814-765-8692

**Project:** SHECKTOR    **Page:** 1/6

**Designed By:** RTH    **Date:** 7/8/20



RAIL OF LADDER

.335 inches

$\frac{5}{16}"\phi$ BOLT  .3125 inches

CLEAT

75°

UNEVEN GROUND SURFACE

15°

**ANALYSIS**

75°

SHECKTOR'S WEIGHT = 150 LBS

LADDER        = 20 LBS
────────────
170#'s

FLAT SURFACE LOADING:

HORIZONTAL FORCE = 170 LBS (SIN 15°) = 44#'s

COEFF OF FRICTION  MOIST SOIL .3

FORCE TO SLIDE LADDER BASE ON FLAT SURFACE = 170 LBS (.3) = 51#'s

IF CLEAT IS NOT LEVEL OR FLAT  ANGLE NEEDED
TO CAUSE INSTABILITY:



170

15°

$170\# (SIN \theta) = 44$

$\theta = 15°$

GROUND SURFACE

ACTUAL SLOPE TO SCALE

15°

NOTE: SHOULD NOT USE CLEAT ON SOIL SURFACE ONLY ON FLAT SURFACE